[No. B108122. Second Dist., Div. Two. Mar. 2, 1998.]

SIRI HONGSATHAVIJ, Plaintiff and Appellant, v.
QUEEN OF ANGELS/HOLLYWOOD PRESBYTERIAN MEDICAL
CENTER et al., Defendants and Respondents.

**COUNSEL**

Henry R. Fenton and Douglas B. Schwab for Plaintiff and Appellant.

Catherine I. Hanson and Christiana G. Macfarlane as Amici Curiae on behalf of Plaintiff and Appellant.

Rushfeldt, Shelley & Drake, Randall L. Shelley, Christine T. Hoeffner and Dawn Cushman for Defendants and Respondents.

McDonough, Holland & Allen and Ann O'Connell as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**BOREN, P. J.**—Appellant, Dr. Siri Hongsathavij, was a member of the medical staff of respondent, Queen of Angels/Hollywood Presbyterian Medical Center (the Medical Center). After Dr. Hongsathavij was removed from the Medical Center's emergency room "call panel" (which did not affect his staff privileges at the Medical Center), he had a court-ordered hearing before a hospital judicial review committee (JRC), composed of peer physicians

from the Medical Center staff. The JRC determined that there was insufficient basis to remove Dr. Hongsathavij from the panel and recommended his reinstatement. The Medical Center appealed the matter to its board of directors (acting as an Appeal Board), which determined that the JRC's findings lacked evidentiary support and that Dr. Hongsathavij was properly removed from the panel and should not be reinstated. Dr. Hongsathavij then filed a petition for a writ of mandate, complaining that the Appeal Board acted improperly. The superior court denied the petition, and we affirm.

FACTS

*Background*

From October 1990 through approximately January 1991, Dr. Hongsathavij was on the call panel of the Medical Center for OB/GYN physicians who served, among others, pregnant patients coming through the emergency room of the Medical Center. The call panel was a rotating list of doctors available to treat patients in the emergency room. Dr. Hongsathavij earned approximately $17,000 a month from the call panel alone. Los Angeles County (the County) had contracted with the Medical Center to provide obstetrical and newborn care for eligible County patients who could not be placed in a County hospital due to a lack of available space. The County also had contracted with Dr. Hongsathavij to provide prenatal, obstetrical and newborn services to patients whose care was then paid for by the County. Many but not all of the patients who entered the Medical Center's emergency room were County patients.

The Medical Center had only one call panel. There was no separate list of physicians on call to cover the emergency room for non-County patients, as distinguished from County patients. The call panel functioned so that physicians were always compensated. In 90 percent of the cases, payment came either from insurance, from the County (for County patients), or from retroactively authorized Medi-Cal payments. In the remaining 10 percent of cases, the Medical Center itself compensated the doctor at Medi-Cal rates. Physicians at the Medical Center, other than Dr. Hongsathavij, generally understood or agreed that their emergency room services entailed treatment of all walk-in patients, including both County and non-County patients. Many were expressly informed that they had to see non-County patients to participate on the call panel. Some physicians considered treatment of all patients to be a moral obligation and thought it ethically improper to determine payment status before delivering a baby. Others were initially reluctant to treat non-County emergency room walk-ins, but were told it was a requirement if they wanted to be on the call panel.

However, Dr. Hongsathavij viewed the call panel as a panel only for County patients and did not want to treat non-County patients in the emergency room. He was the only doctor on the call panel who refused to treat non-County patients. He asserted that he understood the call panel was only to service County patients (for which a physician needed no malpractice insurance, as he would be indemnified by the County), and that he thus was not obligated to provide treatment for walk-in deliveries (for which he would need his own malpractice insurance).

*The Incident and Removal From the Call Panel*

On January 23, 1991, a patient in premature labor arrived in the emergency room of the Medical Center. The patient was 29 years old, had no prenatal care, had active vaginal bleeding, and admitted a history of drug abuse during her first trimester of pregnancy. The emergency room doctor contacted Dr. Hongsathavij, who admitted the patient to the hospital and had her transferred from the emergency room to the labor and delivery floor. She was admitted to the labor and delivery floor, but Dr. Hongsathavij refused to treat the patient because he discovered she was not a County-referred patient.

After Dr. Hongsathavij refused to treat the patient, Medical Center administrator Ronald Dahlgren requested Dr. Boyd Cooper to take the patient under his care. Dr. Cooper was at home and not then on call, but agreed to come to the Medical Center and treat the patient. Before Dr. Cooper accepted the patient, he contacted Dr. Hongsathavij and admonished him about his obligation to treat the patient. Dr. Hongsathavij told Dr. Cooper that he did not want to treat the patient because he did not have medical malpractice insurance. Dr. Cooper stated that he had to have insurance because he was on the hospital staff, and Dr. Hongsathavij replied, "Well, I'm still not going to take the patient." The Medical Center administrator also that day admonished Dr. Hongsathavij that he had to accept non-County patients. However, he still refused to care for that pregnant patient, and Dr. Cooper delivered her infant later the same day.

Dr. Hongsathavij was subsequently removed from the Medical Center's emergency call panel by the Medical Center's administrator. Dr. Hongsathavij filed a mandamus action in superior court seeking reinstatement. In June of 1993, the superior court granted the petition for a writ of mandate, ordered the Medical Center to reinstate Dr. Hongsathavij on what it termed "the County's admission and referral list," provided he otherwise qualified,

and directed the Medical Center to conduct a hearing in accordance with the Medical Center's medical staff bylaws.[1]

*The Charges Against Dr. Hongsathavij*

The Medical Center asked its medical staff's medical executive committee (MEC) to conduct the court-mandated hearing, pursuant to the medical staff's bylaws. The MEC impaneled a JRC by appointing five physicians from its ranks, but it refused to issue notice of charges and thus declined to prosecute the case against Dr. Hongsathavij. To comply with the court-ordered hearing, the Medical Center's administrative risk management staff, on behalf of the Medical Center's governing body (i.e., its board of directors), assumed the task of issuing a notice of charges and representing the Medical Center at the hearing.[2]

The six charges against Dr. Hongsathavij were as follows: (1) abandonment of a patient; (2) failure to evaluate and stabilize the patient, subjecting himself and the hospital to "COBRA" violations;[3] (3) failure to honor the terms of the agreement between the staff OB/GYN physicians and the hospital regarding emergency room coverage; (4) failure to inform the hospital that he did not want to service the emergency room patients; (5) failure to provide documentary proof of medical malpractice insurance to

[1] No appeal was taken from that order, and we express no opinion as to the superior court's action in that matter.

[2] The medical staff bylaws authorize the board of directors to initiate and to prosecute disciplinary proceedings where the medical staff's MEC refuses to do so.

Hospitals are required by law to have a medical staff association which oversees physicians who are given staff privileges to admit patients and practice medicine in the hospital. A hospital's medical staff is a separate legal entity, an unincorporated association, which is required to be self-governing and independently responsible from the hospital for its own duties and for policing its member physicians. (Health & Saf. Code, §§ 1250, subd. (a), 32128; Cal. Code Regs., tit. 22, § 70701, subd. (a)(1)(D), (a)(1)(F); Bus. & Prof. Code, § 2282; see *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 809-810 [140 Cal.Rptr. 442, 567 P.2d 1162].) A medical staff and its MEC operate under bylaws created by the medical staff. (Cal. Code Regs., tit. 22, § 70703, subd. (b).)

[3] COBRA is the acronym for the federal Comprehensive Omnibus Budget Reconciliation Act of 1986 (42 U.S.C. § 1395dd), which is also referred to as the Emergency Medical Treatment and Active Labor Act (EMTALA). COBRA was enacted to curb patient "dumping," the refusal to treat indigent patients in medical emergencies. (*Stevison by Collins* v. *Enid Health Systems, Inc.* (10th Cir. 1990) 920 F.2d 710, 713.) Congress intended that patients with emergency medical conditions receive proper medical care for their emergency conditions regardless of their financial resources. (*Ibid.*; *Thornton* v. *Southwest Detroit Hosp.* (6th Cir. 1990) 895 F.2d 1131, 1134.) Title 42 of the United States Code, section 1395dd(h), expressly precludes any delay of treatment "in order to inquire about the individual's method of payment or insurance status." Monetary penalties of $50,000 may be imposed against any "physician on-call" for his noncompliance with COBRA. (42 U.S.C. § 1395dd(d)(1)(B).)

cover emergency room, non-County contract patient care; and (6) failure to comply with medical staff rules and regulations.

*Evidence at the JRC Hearing*

On the issue of Dr. Hongsathavij's acceptance and then abandonment of the patient, Dr. Hongsathavij acknowledged at the hearing that after talking with the emergency room physician, he accepted as a patient the pregnant woman in question and then had her transferred to labor and delivery. An emergency room doctor cannot admit patients to the hospital; only attending physicians admit patients. But for rare exceptions, the Medical Center does not transfer a patient from the emergency room to the labor and delivery floor (i.e., does not admit a patient) unless and until a physician with staff privileges accepts the patient into his care. According to Dr. Jacob Fookary, an emergency medicine specialist at the Medical Center, the standard of care and the standard of practice in the Medical Center was that once a patient is accepted by a physician, the patient becomes that physician's patient and is under that physician's care and responsibility.

According to Dr. Cooper, once Dr. Hongsathavij accepted the pregnant woman in question as a patient, Dr. Hongsathavij became responsible for her care. Even when a physician has made a mistake about the patient's identity, the physician's duty to treat the patient remains until another doctor has assumed responsibility for the patient. Dr. Cooper, as well as Dr. Hongsathavij's two expert witnesses—Dr. Louis Acosta (an emergency room physician) and Dr. William Hummer, agreed that the refusal to care for a patient whom a physician arranges to admit constitutes abandonment. Dr. Hummer concluded that the patient in question had not been abandoned. This conclusion was based on the assumption that Dr. Hongsathavij had not accepted the patient because he had not yet offered her any treatment and on the theory that Dr. Hongsathavij had no obligation to a patient he did not want to accept. Dr. Hummer, however, was unaware that Dr. Hongsathavij had previously acknowledged that he had in fact accepted the woman in question as a patient for treatment.

Dr. Acosta also acknowledged that, as indicated by the emergency room chart, Dr. Hongsathavij had agreed to undertake the care of the patient, but then did not issue any orders for her care or treatment. In fact, Dr. Hongsathavij told the nursing director on duty, Nurse Mary Cox, that he "did not want to take care of the patient [and] that his insurance would not allow him to do so." She considered the patient "high-risk" and was concerned about the patient's blood pressure and the fact that she had no treatment orders and

no physician who "was going to take care of her." Dr. Hongsathavij told a Nurse Laura Velastegui that he would "stand by later" in case there was an emergency, but he never told Nurse Cox that he was "standing by" to treat the patient. In Nurse Cox's opinion, anytime "we have a patient [who] doesn't have a physician, that's a dangerous situation. I need the physician to tell us what to do, how to take care of her."

The medical experts at the JRC hearing—Drs. Cooper, Fakoory and Acosta—agreed that the patient in question was a high-risk patient. Dr. Cooper also explained that the patient had ruptured membranes, which alone presented the potential for infection and harm, and required the presence and care of an obstetrician. The patient's history of no prenatal care, vaginal bleeding, premature rupture of membranes, premature labor, low amniotic fluid and drug abuse indicated a high-risk patient. Even though there was no immediate need for a physician's attention when the patient arrived in labor and delivery and the patient's vital signs were stable, a physician's care was still needed.

Dr. Hummer agreed that the patient's baby tested positive for drugs, indicating the patient's recent drug usage. Dr. Hummer then acknowledged that, based upon the Medical Center's rules and regulations regarding high-risk cases and records showing the patient's drug abuse, the patient's history of drug abuse indeed constituted a high-risk factor. Dr. Acosta admitted that "the patient was never taken care of or examined or no orders were written" by Dr. Hongsathavij. It was uncontroverted at the hearing that Dr. Hongsathavij did not offer the patient in question any treatment after he accepted her as his patient.

Testimony at the hearing by expert witness Paul Viviano, a hospital administrator, further established that federal COBRA laws require that physicians not delay examination or treatment in an emergency by inquiring as to the patient's ability to pay for health care. COBRA defines an emergency condition to include a pregnant woman having contractions where a transfer to another facility would pose a threat to the woman or the baby. COBRA imposes a duty upon the physician to stabilize the emergency condition. In the case of a pregnant woman, the duty to stabilize requires delivery of the baby, including delivery of the placenta. Until the emergency condition is stabilized and the baby and placenta delivered, no inquiry can be made into the patient's ability to pay for medical services. COBRA violations can result in substantial fines to both the physician and the hospital, and a hospital could lose the ability to participate in Medicare and Medi-Cal programs.

Dr. Acosta acknowledged that under COBRA requirements, the patient in question qualified as an emergency patient. He also admitted that COBRA requires the patient be cared for through delivery and prohibits inquiry as to the patient's method of payment until the patient is stabilized. Moreover, as Dr. Acosta indicated, because COBRA prohibits such inquiry when a patient arrives in the emergency room, a hospital is prohibited from creating a call panel which would require inquiry about a patient's payor status.

Dr. Hummer testified that Dr. Hongsathavij had no duty to evaluate and stabilize the patient. However, this conclusion was based upon Dr. Hummer's opinion that the patient "certainly was not in any type of dire or emergency straits by the time she got up to the labor and delivery area." Dr. Hummer later admitted that the patient in question met COBRA criteria of an emergency patient because she was a pregnant woman having contractions, she had certain risk factors, and Dr. Hongsathavij had provided no treatment to her.

Although Dr. Hongsathavij concluded the patient did not present an emergency, he did not make this opinion in the context of COBRA laws. Dr. Hongsathavij based his opinion on the fact that he had been advised the patient's vital signs were stable. Dr. Hongsathavij nonetheless admitted she was a high-risk pregnant patient who was not "within normal limits."

Testimony at the JRC hearing also addressed the issue of Dr. Hongsathavij's malpractice insurance. On January 23, 1991, Dr. Hongsathavij told three people he did not have insurance to cover him in the emergency room context. He told Nurse Cox that his malpractice insurance would not allow him to treat patients admitted from the emergency room or to care for the patient in question. Nurse Cox then promptly spoke with the Medical Center administrator, Mr. Dahlgren, who in turn contacted Dr. Hongsathavij and was told by him that his malpractice insurance prohibited him from treating patients coming through the emergency room. Dalghren told Dr. Hongsathavij at that time that until he had emergency room malpractice insurance, he could not serve on the call panel. Dr. Hongsathavij also told Dr. Cooper that he had no insurance. The following month's call panel was then revised by Dahlgren to eliminate Dr. Hongsathavij from the list. This action had no effect on Dr. Hongsathavij's medical staff privileges at the Medical Center.

At the JRC hearing, Dr. Hongsathavij denied he told Dahlgren that his malpractice insurance did not cover patients coming through the emergency room. Rather, Dr. Hongsathavij claimed he told Dahlgren that he was "in a high-risk category with my malpractice insurance, and my insurance wouldn't be happy if I'm taking more risk than I [am] supposed to."

The Medical Center introduced evidence that Dr. Hongsathavij arguably had not made truthful statements on his insurance application to Physicians Interindemnity Trust (PIT), and thus by implication might not have been covered for tort liability as to non-County patients, even if the PIT policy was in effect. When Dr. Hongsathavij applied for insurance through PIT, he indicated that he had never had any insurance "refused, declined, cancelled, or accepted on special terms." In fact, Dr. Hongsathavij's former insurance company refused to "renew" his policy because of the number of times he had been sued for malpractice. Dr. Hongsathavij had also represented to PIT that he was "not affiliated in any capacity" with "any facility designated for, or providing, emergency care." However, he admitted at the hearing that he treated some of his private patients and those of other doctors on occasion in the Medical Center emergency room, and that his contract with the County required him to provide County-referred patients with emergency medical services.

On February 26, 1991, Dr. Hongsathavij wrote a letter to Dalhgren requesting reinstatement to the "County" call panel and asserting he had insurance which covered all areas of the hospital. Dr. Hongsathavij did not provide the Medical Center administrator with a certificate of insurance or other evidence reflecting malpractice insurance which would have covered him for treatment of non-County patients in the emergency room context. Not until the JRC hearing did Dr. Hongsathavij present a letter from PIT, dated December 13, 1993, indicating he did in fact have an insurance policy in effect covering his emergency room work on the same date he told Dalghren, Dr. Cooper and Nurse Cox that he did not have insurance.

On September 6, 1994, the JRC issued its written statement of decision. The JRC found, in pertinent part, as follows: that there was "no evidence" that Dr. Hongsathavij was "informed of, agreed to, or was contractually required" to treat non-County patients; that the patient in question "was in no immediate danger and no medical emergency existed"; that the Medical Center met its responsibilities to provide care to the patient; and that although he may have led Dahlgren to believe to the contrary, there was "no evidence" Dr. Hongsathavij lacked malpractice insurance, which he did indeed have at the time of his suspension from the call panel.

From those findings, the JRC concluded that no abandonment of a patient had occurred, that no violation of COBRA had occurred, and that Dr. Hongsathavij did not fail to provide documentation of medical malpractice insurance coverage. The JRC made no findings specifically addressing the definition of abandonment under COBRA. The Medical Center appealed the

decision of the JRC to the Medical Center's board of directors, sitting as an Appeal Board. The Appeal Board reversed, finding no substantial evidence to support the JRC's decision. Specifically, the Appeal Board set aside the JRC's conclusions: (1) that Dr. Hongsathavij did not abandon the patient; (2) that he did not violate COBRA; and (3) that he did not fail to provide documentary proof of malpractice insurance. Those three fundamental charges (of the original six) thus remained intact and formed the basis of the Appeal Board's ruling that Dr. Hongsathavij had been properly removed from the call panel and did not satisfy the requirements for reinstatement.

On February 16, 1995, Dr. Hongsathavij again filed a petition for a writ of mandamus, seeking reinstatement on the call panel. The superior court held a hearing and then issued a statement of decision and an order denying the petition. This appeal followed.

DISCUSSION

I.   *The standard of review.*

■    In the present case, the superior court reviewed the decision of the Medical Center's Appeal Board composed of members of the Medical Center's board of directors. Dr. Hongsathavij urges this was error, as the superior court should have reviewed the decision of the JRC. However, pursuant to Code of Civil Procedure section 1094.5, subdivision (a), the role of the superior court in reviewing such a matter is to inquire "into the validity of any final administrative order or decision." As indicated by the bylaws of the medical staff of the Medical Center, the decision of the JRC is not the final administrative decision. Rather, the bylaws provide that the decision of the JRC "shall be subject to such rights of appeal or review as described in these Bylaws, but shall otherwise be affirmed by the Board of Directors as the final action if it is supported by substantial evidence, following a fair procedure." "The decision of the governing body is clearly the 'final' decision rendered in the multilevel administrative review process . . . . [T]he report and recommendation of the [JRC] here is not a 'final' decision which can be appealed from separately." (*Kumar* v. *National Medical Enterprises, Inc.* (1990) 218 Cal.App.3d 1050, 1055 [267 Cal.Rptr. 452].)

Further instructive on the proper role of the superior court in such a context is *Huang* v. *Board of Directors* (1990) 220 Cal.App.3d 1286 [270 Cal.Rptr. 41]. In *Huang*, the governing body on appeal overruled the judicial review committee's decision in favor of the complaining physician and issued its own decision against the physician. The superior court looked only

to see if there was substantial evidence supporting the governing body's action, and finding such evidence, it sustained the governing body's decision. On appeal, the *Huang* court found that the superior court had, in essence, misfocused its inquiry. A threshold issue in all such cases is whether the governing body applied the correct standard in conducting its review. The superior court in *Huang* had not addressed this preliminary question. The Court of Appeal in *Huang* found that the correct standard of review had not been applied by the governing body. The governing body had improperly used its independent judgment rather than implementing the substantial evidence standard required by the bylaws. Under such circumstances, it was thus not appropriate for the superior court to limit its review to whether substantial evidence supported the decision of the governing body. (*Id.* at p. 1294.)

██ Consistent with the analysis in *Huang*, the superior court essentially must determine two issues. First, it must determine whether the governing body applied the correct standard in conducting its review of the matter. Second, after determining as a preliminary matter that the correct standard was used, then the superior court must determine whether there was substantial evidence to support the governing body's decision. To the extent that other cases imply the superior court should review for substantial evidence the decision of the judicial review committee, we find such cases unpersuasive. (See, e.g., *Gaenslen* v. *Board of Directors* (1985) 185 Cal.App.3d 563, 572 [232 Cal.Rptr. 239]; *Cipriotti* v. *Board of Directors* (1983) 147 Cal.App.3d 144, 155 [196 Cal.Rptr. 367].) Indeed, in *Gaenslen* and *Cipriotti*, the courts never had to distinguish carefully which of the decisions (that of the judicial review committee or of the governing body) they were reviewing, because the administrative decisions of both entities were the same.

Accordingly, the superior court cannot focus exclusively on the decision of the judicial review committee, or there would be no purpose for the bylaw provision which permits review of that decision by the hospital's governing body, which then issues the final administrative decision in the matter. A review which does not exclude the governing body's determination is also consistent with the requirement that "in cases arising *from private hospital boards* . . . abuse of discretion is established if the [superior] court determines that the findings are not supported by substantial evidence *in the light of the whole record.*" (Code Civ. Proc., § 1094.5, subd. (d), italics added.)

As to the function of the Court of Appeal, our function in this context is the same as *the superior* court's, which was the same as the hospital's governing body. "Like the trial court, we also review the administrative

record to determine whether its findings are supported by substantial evidence in light of the whole record, our object being to ascertain whether the trial court ruled correctly as a matter of law." (*Bonner* v. *Sisters of Providence Corp.* (1987) 194 Cal.App.3d 437, 444 [239 Cal.Rptr. 530]; see *Pick* v. *Santa Ana-Tustin Community Hospital* (1982) 130 Cal.App.3d 970, 980, fn. 6 [182 Cal.Rptr. 85].) The appellate court thus does not review the actions or reasoning of the superior court, but rather conducts its own review of the administrative proceedings to determine whether the superior court ruled correctly as a matter of law. (*Gaenslen* v. *Board of Directors*, *supra*, 185 Cal.App.3d at p. 573, fn. 5.)

Moreover, an appellate court must uphold administrative findings unless the findings are so lacking in evidentiary support as to render them unreasonable. (*Oskooi* v. *Fountain Valley Regional Hospital* (1996) 42 Cal.App.4th 233, 243 [49 Cal.Rptr.2d 769]; *Gaenslen* v. *Board of Directors*, *supra*, 185 Cal.App.3d at p. 572.) A reviewing court will not uphold a finding based on evidence which is inherently improbable (*Schaffield* v. *Abboud* (1993) 15 Cal.App.4th 1133, 1142 [19 Cal.Rptr.2d 205]), or a finding based upon evidence which is irrelevant to the issues. (*Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 767, 773 [59 Cal.Rptr. 146, 427 P.2d 810]; *City and County of San Francisco* v. *Board of Permit Appeals* (1989) 207 Cal.App.3d 1099, 1109-1110 [255 Cal.Rptr. 307].) Therefore, even if a finding is supported by evidence, if that evidence is irrelevant to the charge, the decision must be reversed for insufficient evidence. (*Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals*, *supra*, 66 Cal.2d at p. 773; *City and County of San Francisco* v. *Board of Permit Appeals*, *supra*, 207 Cal.App.3d at pp. 1109-1110.) Finally, we note that the opinion testimony of expert witnesses does not constitute substantial evidence when it is based upon conclusions or assumptions not supported by evidence in the record. (*Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 [234 Cal.Rptr. 630]; see *Roddenberry* v. *Roddenberry* (1996) 44 Cal.App.4th 634, 651 [51 Cal.Rptr.2d 907].)

II. *The Appeal Board did not improperly substitute its own judgment, as substantial evidence supports its reversal of the JRC's conclusion.*

A review of the entire record indicates there was sufficient evidence to support the decision of the Appeal Board of the Medical Center, which described the findings of the JRC as so lacking in evidentiary support as to render them unreasonable. As discussed below, substantial evidence supports the conclusion that in large part the findings of the JRC were simply nonresponsive to the specific charges and thus not supported by the evidence.

A. *Abschaffung of the patient*

*A. Abandonment of the patient*

First, the JRC's conclusion that Dr. Hongsathavij did not abandon the patient was reversed by the Appeal Board because it lacked evidentiary support. The JRC's finding that there was no evidence that Dr. Hongsathavij had been informed of the requirement to treat non-County patients is unsupportable. To the contrary, evidence established that Dr. Hongsathavij was informed twice on the date of the incident of his obligation (and the Medical Center' requirement) to treat "all comers" if he wanted to be on the call panel. Dr. Cooper and the Medical Center administrator both so advised Dr. Hongsathavij. Evidence that Dr. Hongsathavij's contract with the County and the Medical Center's contract with the County did not require Dr. Hongsathavij to treat non-County patients was irrelevant. The Medical Center required him to do so.

A physician cannot just walk away from a patient after accepting the patient for treatment. A physician cannot withdraw treatment from a patient without due notice and an ample opportunity afforded to secure the presence of another medical attendant. (*Payton* v. *Weaver* (1982) 131 Cal.App.3d 38, 45 [182 Cal.Rptr. 225].) In the absence of the patient's consent, the physician must notify the patient he is withdrawing and allow ample opportunity to secure the presence of another physician. (See BAJI No. 6.05 (8th ed.).) Dr. Hongsathavij does not contest the validity of such well-accepted principles.

Here, Dr. Hongsathavij admitted the emergency room patient in question to the hospital and had her transferred to the labor and delivery floor. Significantly, there is no evidence either that the patient requested or consented to Dr. Hongsathavij's subsequent cessation of treatment, or that Dr. Hongsathavij gave the patient notice he would not treat her. Though there was some evidence he indicated to one of the nurses that he would "stand by," Dr. Hongsathavij never called a substitute physician and was, in fact, unaware of who had ultimately contacted Dr. Cooper to care for the patient. This was patient abandonment.

Dr. Hongsathavij attempts to defend such conduct with technical notions of mistake of fact and contract analysis. We are unpersuaded. Dr. Hongsathavij asserts both he and the emergency room physician were under a mutual mistake of fact that the patient was a County patient when Dr. Hongsathavij agreed to accept her, and that Dr. Hongsathavij acted appropriately when he learned otherwise. However, the mutual mistake purportedly relied upon by Dr. Hongsathavij was a mistake between two physicians,

and not between the physician and the patient. Since, by definition, any mutual mistake of fact must be between the parties to the contract, not between one of the parties and a third person (see *Hernandez* v. *Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1813, fn. 18 [34 Cal.Rptr.2d 732]; Civ. Code, § 1577), such a theory is inapplicable.

Nor was it of any consequence to the abandonment charge that Dr. Cooper arrived at the Medical Center in approximately 45 minutes, or that the patient—whom Dr. Hongsathavij admitted was a high-risk patient—was not in need of immediate attention from a physician. All parties concerned should consider themselves fortunate there were no mishaps or untoward occurrences for this patient or her baby.

### B. *COBRA violations*

■ The obligation of a physician under COBRA laws is to provide any emergency patient with either the necessary stabilizing treatment or a transfer to an appropriate medical facility. (42 U.S.C. § 1395dd(b)(1).) An emergency medical condition under COBRA is defined to include any "pregnant wom[a]n who is having contractions" (42 U.S.C. § 1395dd(e)(1)(B), fn. omitted), and any common medical definition of "emergency" or "active labor" is rendered irrelevant. (*Burditt* v. *U.S. Dept. of Health and Human Services* (5th Cir. 1991) 934 F.2d 1362, 1369.) COBRA is intended to provide treatment protection to all pregnant women having contractions "who have any complication with their pregnancies regardless of delivery imminency." (934 F.2d at p. 1370.) To come within the scope of COBRA, it is only necessary to show the presence of a possible threat of harm to the pregnant woman or the unborn child. COBRA does not require proof of a reasonable medical probability that a "threat will come to fruition." (934 F.2d at p. 1370.)

COBRA thus compels a physician either to transfer the high-risk pregnant woman or to provide "such treatment as may be required to stabilize the medical condition." (42 U.S.C. § 1395dd(b)(1)(A).) "To stabilize" is a term, again defined in COBRA, which in the emergency context of a pregnant woman with contractions means "to deliver (including the placenta)." (42 U.S.C. § 1395dd(e)(3)(A).) Therefore, a physician violates COBRA when he refuses to treat a pregnant woman having contractions (by definition, an emergency) through delivery of her baby (including the placenta). (See *Burditt* v. *U.S. Dept. of Health and Human Services, supra,* 934 F.2d at p. 1376 [$20,000 penalty against physician affirmed].)

In the present case, the facts elicited by Dr. Hongsathavij on the COBRA issue were essentially irrelevant. One of his expert witnesses, Dr. Acosta,

expressed the legal opinion that COBRA did not "fit with this case, with this situation," but thereafter admitted that the patient in question qualified as an emergency patient under COBRA. The patient was in active labor, which required stabilizing treatment under COBRA. Dr. Hummer, another expert witness for Dr. Hongsathavij, testified that the patient was not in a "dire" emergency and was stable. But that did not address COBRA's definition of an emergency.

The JRC then relied upon such irrelevant testimony in addressing the COBRA issue. The following findings by the JRC were thus of no consequence: that the patient was in no immediate danger; that the patient received nursing care throughout her hospitalization and was appropriately treated at the Medical Center during her entire time there after admission; and that the Medical Center met its responsibilities to provide care to the patient. The JRC's conclusion that no COBRA violation occurred was based on facts irrelevant to that issue. That the Medical Center in essence bailed Dr. Hongsathavij out of a potentially disastrous situation and that fortunately nothing untoward befell the patient do not establish the absence of a COBRA violation.

Moreover, Dr. Hongsathavij's contention that he was not subject to the requirements of COBRA because he was purportedly not on call for non-County patients flies in the face of the very purpose and function of COBRA. As previously noted, COBRA was designed to prohibit physicians from limiting their care of emergency patients (contractually or otherwise) to only those with financial resources to pay or to those who could indemnify for any malpractice claims. Dr. Hongsathavij was thus not at liberty under COBRA to accept an emergency room patient and then reject that patient who had no means to pay for his services and no means of indemnity for any malpractice.

Accordingly, the JRC's findings on the COBRA issue were not relevant. Substantial evidence supports the Appeal Board's decision to reverse the decision of the JRC, and the superior court's ruling was proper as a matter of law.

C. *The malpractice insurance issue*

The JRC's finding on the issue of insurance was based on evidence irrelevant to the issue and otherwise so lacking in evidentiary support as to be unreasonable. Significantly, the specific charge against Dr. Hongsathavij was not that he did not have medical malpractice insurance, but rather that upon request he failed "to provide documentary proof of medical malpractice insurance to cover emergency room, non-county contract patient care."

The JRC's irrelevant finding was that, "Although Dr. H[ongsathavij] may have made statements which led Mr. Dahlgren to believe he lacked malpractice insurance, there was no evidence that Dr. H[ongsathavij] lacked such insurance, and Dr. H[ongsathavij] presented evidence that he did indeed have malpractice insurance at the time of the suspension." The JRC also concluded that the Medical Center could have verified Dr. Hongsathavij's insurance through the medical staff office.

First, it is uncontested that the medical staff bylaws provide for the automatic suspension of privileges of a physician for lack of malpractice insurance, and that such privileges remain suspended until evidence is provided to the MEC that the physician has secured appropriate professional liability insurance. Although in the present case on-call status and not staff privileges was the issue, the requirement that Dr. Hongsathavij provide proof of coverage was eminently reasonable under the circumstances of evidence of his denial of having appropriate coverage.

Second, three people—Nurse Cox, Dahlgren and Dr. Cooper—testified Dr. Hongsathavij told them on three separate occasions that he did not have insurance to cover the emergency room. Even Dr. Hongsathavij admitted he told Dahlgren that he was "in a high-risk category with my malpractice insurance, and my insurance wouldn't be happy if I'm taking more risk than I [am] supposed to." Thus the JRC's conclusion that there was "no evidence" Dr. Hongsathavij lacked insurance is a blatant error and contradicted by the evidence.

Third, although on February 26, 1991, Dr. Hongsathavij wrote a letter to Dahlgren requesting reinstatement to what he referred to as the "County" call panel and claimed he had insurance which covered all areas of the hospital, he offered no documentation reflecting malpractice insurance to cover his non-County emergency room work. Not until the JRC hearing approximately two years later did Dr. Hongsathavij present a letter from PIT indicating he did have an appropriate insurance policy in effect at the time, approximately three years earlier, when he had told Nurse Cox, Dahlgren and Dr. Cooper that he did not have insurance. But this belated letter had no probative value on the issue of Dr. Hongsathavij's failure to present documentary evidence to the Medical Center in 1991, several months after removal from the call panel, as he was required to do.

Again there was substantial evidence in support of the conclusion that the JRC's findings on this matter were so lacking in evidentiary support as to be unreasonable.

III.  *Dr. Hongsathavij was not denied a fair procedure.*

██  Dr. Hongsathavij contends that the Medical Center's governing body (i.e., its board of directors) should not have been permitted to render a final decision in this matter, because the Medical Center's administrator had initiated the suspension, the Medical Center's risk management staff prosecuted the action, and then the Medical Center's governing body heard the appeal. Dr. Hongsathavij further suggests that a voir dire of the appeal body, consisting here of the entire board of directors, was a necessary prerequisite to a legitimate appeal, and that the Medical Center had an improper financial interest because it would be subject to potential money damages if it affirmed the JRC decision.

Dr. Hongsathavij assumes bias by the Medical Center. However, bias in an administrative hearing context can never be implied, and the mere suggestion or appearance of bias is not sufficient. (*Gill* v. *Mercy Hospital* (1988) 199 Cal.App.3d 889, 911 [245 Cal.Rptr. 304].) It is also well established that a party is not denied an impartial adjudicator merely because an administrative entity performs both the functions of prosecutor and judge. (*Griggs* v. *Board of Trustees* (1964) 61 Cal.2d 93, 98 [37 Cal.Rptr. 194, 389 P.2d 722].) Overlapping investigatory, prosecutorial and adjudicatory functions do not necessarily deny a fair hearing and are common before most administrative boards. (*Rhee* v. *El Camino Hospital Dist.* (1988) 201 Cal.App.3d 477, 490 [247 Cal.Rptr. 244]; *Smith* v. *Vallejo General Hospital* (1985) 170 Cal.App.3d 450, 459 [216 Cal.Rptr. 189]; *Hohreiter* v. *Garrison* (1947) 81 Cal.App.2d 384, 392 [184 P.2d 323].) By the very nature of an internal administrative peer review process, a hospital or one of its representatives is likely to be involved in the initiation and prosecution of charges, including any appeal process.

Nor was there any bias or "practical probability of unfairness" (*Applebaum* v. *Board of Directors* (1980) 104 Cal.App.3d 648, 659 [163 Cal.Rptr. 831]) since none of the people involved in the process had any overlapping memberships in both the adjudicatory body and the reviewing appeal board. (See *Rhee* v. *El Camino Hospital Dist., supra,* 201 Cal.App.3d at p. 491; *Anton* v. *San Antonio Community Hospital* (1982) 132 Cal.App.3d 638, 648 [183 Cal.Rptr. 423].) As the trial court below also aptly recognized, it was the administrator (not·the governing body itself) which initially imposed the action giving rise to the hearing, and the risk management department (not the governing body) prosecuted the hearing. The governing body did not become actively involved until it assumed an appellate role. Moreover, where an administrative body has a duty to act, and is the only entity capable

of acting, the fact that the body may have an interest in the result does not disqualify it from acting. The rule of necessity precludes a claim of bias from the structure of the process. (See *Griggs* v. *Board of Trustees, supra,* 61 Cal.2d at p. 98; *Gonsalves* v. *City of Dairy Valley* (1968) 265 Cal.App.2d 400, 404 [71 Cal.Rptr. 255].)

In essence, Dr. Hongsathavij's position is that if the governing body believes an action against a physician is necessary, and if the medical staff disagrees, then the medical staff gets to make the final decision, since the governing body is tainted by its initial position on the matter. Such a proposition establishing medical staff sovereignty is untenable. Ultimate responsibility is not with the medical staff, but with the governing body of the hospital.

Certain policy considerations must be borne in mind. Hospital governing body members have fiduciary duties as directors and under certain circumstances have exposure to personal liability. (See Corp. Code, §§ 309 [corporations, generally], 5231 [nonprofit benefit corporations], 7231 [nonprofit mutual benefit corporations], and 9241 [nonprofit religious corporations].) A hospital itself may be responsible for negligently failing to ensure the competency of its medical staff and the adequacy of medical care rendered to patients at its facility. (*Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332, 346 [183 Cal.Rptr. 156].) A hospital has a duty to ensure the competence of the medical staff by appropriately overseeing the peer review process. (*Id.* at pp. 338, 341-342, 347.) Hospital assets are on the line, and the hospital's governing body must remain empowered to render a final medical practice decision which could affect those assets. A hospital's governing body must be permitted to align its authority with its responsibility and to render the final decision in the hospital administrative context.

IV.  *The Medical Center had a right to appeal the decision of the JRC.*

Dr. Hongsathavij accurately observes that the medical staff bylaws only provide that either the member physician or the MEC may request an appellate review of a JRC decision. He thus asserts the Medical Center improperly appealed the matter to its own board. For whatever reason, the medical staff bylaws provide no specific right of the Medical Center to appeal for actions initiated by the governing body. Nonetheless, we find the review sought by the Medical Center in the present case did not constitute a material deviation from the bylaws.

The Medical Center's medical staff bylaws apparently did not envision a situation, as occurred here, where the superior court directed the hospital to

conduct a hearing, but where the tension between the hospital and its medical staff was such that the MEC would not assume a role in such proceedings. Under such circumstances, the hospital did what was appropriate. It provided a JRC hearing, and the governing body reviewed the results of that hearing to determine whether the conclusions were supported by substantial evidence. Given the peculiar dynamics and procedural posture of the situation, the governing body fairly interpreted the bylaws and dealt with the matter consistent with its ultimate responsibility for the activities of the medical staff and the hospital.

## DISPOSITION

The order under review is affirmed.

Nott, J., and Zebrowski, J., concurred.