787 A.2d 807

**Cynthia D. SADLER, et al.,**

v.

**DIMENSIONS HEALTH CORPORATION, et al.**

**No. 1625, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Dec. 28, 2001.

Laurence S. Kaye (Eric L. Siegel and Henrichsen, Siegel, P.L.L.C. on the brief), Washington, DC, for appellants.

Phillip R. Zuber (Sheila F. Flashman and Sasscer, Clagett & Bucher on the brief), Upper Marlboro, for appellees.

Argued before JAMES R. EYLER, KRAUSER and ROBERT L. KARWACKI, (Retired, specially assigned), JJ.

KARWACKI, Judge, Retired, specially assigned.

This appeal had its genesis in a decision by the Board of Directors of Prince George's Hospital Center ("the hospital") to refuse Cynthia D. Sadler, M.D., the appellant, privileges of admitting patients to the hospital. That decision was based upon a recommendation of an Ad Hoc Committee of the Medical Staff of the hospital ("the hearing committee").

Dr. Sadler and her corporation, Metropolitan Health Care Plus, Inc., filed suit in the Circuit Court for Prince George's County against multiple defendants[1] claiming damages for alleged breach of contract and several torts. Also sought was a declaratory judgment that Dr. Sadler's privileges at the hospital had been illegally terminated. The defendants moved to dismiss the seven count Complaint.[2] A hearing on those motions was held on April 4, 2000, at which time the trial court (James J. Lombardi, Jr.) granted the motions of the Hopkins defendants and Dr. Goldman; at that hearing Metropolitan withdrew its claims for breach of contract and breach of the covenant of good faith and fair dealing contained in Counts I and II of the Complaint. Also, the trial court agreed to consider certain materials outside of the Complaint in ruling on the motions to dismiss, thereby converting those motions into ones for summary judgment. *See* Maryland Rule 2–322(c). The trial court took the matter under advisement as to the balance of the appellants' claims. An amended complaint was filed on April 14, 2000, by the appellants. In it the appellants no longer pursued their claim against the Hopkins Defendants, again stated the same claims against Dr. Gold-

---

1. The defendants named were Dimensions Health Corporation ("DHC"), a non-profit corporation which operates the hospital; the hospital's president, Allen E. Atzrott; the president of the medical staff of the hospital, Stephen Werner, M.D.; the vice president of medical affairs of the Hospital, Donald M. Goldman, M.D.; three obstetricians on the staff of the hospital, Shahnaz Quraishi, M.D., Raymond Cox, M.D., and Jeanette Ahkter, M.D.; two obstetricians from the staff of Johns Hopkins University Hospital, Harold Fox, M.D. and George Huggins, M.D. and Johns Hopkins University Hospital ("the Hopkins defendants").

2. Count I alleged breach of contract by DHC. Count II alleged a breach by DHC of the implied covenant of good faith and fair dealing. Count III asserted claims against the Hopkins defendants for negligence. Count IV set forth a claim against Dr. Goldman and DHC for tortious interference with prospective advantage. Count V alleged a claim of tortious interference with contract against Drs. Ahkter, Cox and Quraishi. Count VI asserted a tortious interference with prospective advantage against DHC and Drs. Atzrott, Werner, Cox, Ahkter, Quraishi and Goldman. ·Count VII alleged civil conspiracy by DHC and Drs. Atzrott, Werner, Cox, Ahkter, Goldman and Quraishi.

man, and restated their claims for declaratory relief in a Count 8. On June 2, 2000, the trial court rescheduled argument on the motion and directed the parties to brief the issue of the appropriate standard to be applied in ruling on the motion. After hearing further oral argument on July 28, 2000, the court entered judgment in favor of all remaining defendants. This appeal ensued.

The principal issue which we are called upon to resolve in this appeal is the proper standard by which the courts should review a decision of the board of directors of a privately owned hospital as to who should have staff privileges at the hospital. The appellate courts of this State have not heretofore addressed that question.

### Background

Dr. Sadler, who specializes in obstetrics and gynecology (OB/GYN) applied for medical staff privileges in the hospital's department of OB/GYN on July 10, 1992. In that application, Dr. Sadler agreed to subject her "clinical performance to, and participate in, the hospital's quality assurance programs as the same shall from time-to-time be in effect." Pending receipt of further information on her application for medical staff privileges, she applied for and was granted temporary privileges on February 24, 1993.

In April, 1993, three incident reports concerning Dr. Sadler were filed. They involved her failure to respond to calls and initiate timely treatment, a broken humerus and permanent nerve injury following a birth, and a retained surgical sponge. The Patient Care Committee of the OB/GYN Department ("PCC")[3] reviewed the reports and concluded that continued observation of Dr. Sadler's "pattern of practice" was warranted.

---

**3.** Under the hospital's medical staff bylaws, each Department is required to have a patient care committee to review, *inter alia,* information on practitioners, to make recommendations on re-appointment and delineation of privileges, and to conduct surgical care reviews.

When Dr. Sadler's application for medical staff privileges came before the hospital's credentials committee, action was deferred so that additional information could be obtained on her activities at Laurel Regional Hospital, where she previously had privileges. On July 8, 1993, the chairman of the credentials committee learned that Dr. Sadler was responsible for 28% of the quality assurance reviews at that hospital during her tenure there. Furthermore, he learned that when Dr. Sadler was informed by Laurel Regional Hospital that she was going to be monitored for a period of several months, she did not apply for reappointment to its medical staff.

On November 1, 1993, Dr. Sadler was granted provisional privileges for two years at the hospital.[4] Her provisional privileges were extended by the Board of Directors in November 1994.

From September 1994 to July 1995, the PCC was referred sixteen of Dr. Sadler's cases, seven of which were found to involve significant opportunities for improvement and four involved breaches of the standard of care. On October 24, 1995, at the request of Dr. Cox and Dr. Quraishi, members of the OB–GYN department, Dr. Sadler met with the Director of Risk Management of the hospital and reviewed her entire medical staff credential file, including her incident reports. The PCC met with Dr. Sadler in November 13, 1995, to review five cases. Three involved non-indicated or precipitous cesarean sections and two involved delayed responses to calls from the hospital staff. Following that review, the PCC recommended that Dr. Sadler consult with more senior practitioners for second opinions before performing cesarean sections.

Dr. Quraishi, who had become the chair of the OB/GYN department, refused to rate Dr. Sadler satisfactory on the provisional evaluation of her for the period from November

---

4. Under the Bylaws of the medical staff of the hospital, all physicians who are granted privileges by the Board of Directors are automatically placed on a provisional status for two years. If recommended by the credentials committee of the hospital, that provisional status may be extended for a longer period.

1994 until April 1995, because of fourteen multiple risk management reports, five involved substantial opportunities for improvement and one involved a breach of standard of care. On August 12, 1996, Dr. Quraishi in the provisional evaluation of Dr. Sadler's performance for the period from April 1995 to October 1995, rated it as unsatisfactory.

On September 3, 1996, Dr. Quraishi, as chief of the OB/GYN department recommended to the credentials committee that Dr. Sadler's provisional status be extended for an additional six months and that her activities be "closely monitored." On October 22, 1996, the credentials committee recommended that Dr. Sadler's provisional status be extended for an additional six months with monitoring to be set by the Medical Executive Committee of the hospital ("MEC").

On November 11, 1996, the PCC met to review several of Dr. Sadler's cases. That committee discussed the cerclage [5] procedures performed by Dr. Sadler and recommended that an Ad Hoc Committee review that performance.

The MEC, acting on the recommendation of the credentials committee, voted on November 12, 1996, to extend Dr. Sadler's provisional privileges for an additional six months due to "repeated peer review and risk management issues." An oversight committee for all departments of the medical staff also decided that day to recommend to the OB/GYN department that it retain the services of an outside consultant to review Dr. Sadler's patient care.

On December 2, 1996, certain members of the OB/GYN department met with Dr. Sadler to discuss the incident reports on her, her professional behavior and other departmental issues. At that meeting, Dr. Sadler was provided copies of all the incident reports. In reply, Dr. Sadler claimed that staff members were "out to get her" and questioned why she

---

5. Cerclage—The placement of a nonabsorbable suture around a functionally incompetent uterine cervix. STEDMAN'S MEDICAL DICTIONARY, 1995 ed.

was being singled out. She also stated that there was a group of nurses who were against her.

Harold Fox, M.D., Professor and Chief of OB/GYN at Johns Hopkins Hospital, and George R. Huggins, M.D., Associate Director of OB/GYN at Johns Hopkins Hospital and Director at Bayview Hospital, were retained by the OB/GYN department of the hospital on April 4, 1997, to review charts of a broad spectrum of OB/GYN cases of Dr. Sadler and random charts of other members of the OB/GYN department of the hospital. Following that review, they concluded that there was "a significant opportunity for improvement in both documentation and patient management" by Dr. Sadler. They recommended in their report that Dr. Sadler be subjected to case-by-case premonitoring for surgical indications. At an emergency meeting on April 25, 1997, the MEC considered the report of Drs. Fox and Huggins, the cerclage review findings, a chronology of events, and the recommendations of the PCC and the credentials committee. Based upon that review, all members of the MEC (seventeen present), with the exception of Dr. Frederick Corder, voted not to extend Dr. Sadler's provisional privileges beyond July 27, 1997, and until that time to impose monitoring and proctoring.

Dr. Sadler was notified of the decision of the MEC on April 28, 1997, by a hand-delivered letter from Dr. David M. Goldman, the Vice President for Medical Affairs of the hospital. That letter also advised Dr. Sadler that since the action to terminate her privileges was an adverse action, she had a right to request a hearing pursuant to the provisions of the bylaws. Dr. Sadler exercised that right on May 10, 1997.

## The Hearing

Article VII.A.1 of the Bylaws provides:

When any practitioner receives notice of a recommendation of the Executive Committee that, if ratified by the Board of Directors, will adversely affect his appointment to or status as a member of the Medical Staff or his right to exercise clinical privileges, he shall be entitled to a hearing before an ad hoc committee of the Medical Staff. If the recommenda-

tion of the Executive Committee following such hearing is still adverse to the affected practitioner, he shall then be entitled to an appellate review before the Board of Directors.

On May 22, 1997, Dr. Sadler was notified that a hearing would be held on June 24, 1997, before an Ad Hoc Committee ("the hearing committee") formed pursuant to the bylaws. When Dr. Sadler requested a postponement from that date, Dr. David M. Goldman, replied as follows:

By requesting a postponement of the hearing, you are waiving your right to have a hearing within the time frame set forth in the Bylaws, as well as any right you may have under the applicable law to a more expeditious hearing. In addition, your requested postponement will place the hearing date after the expiration of your privileges at the Hospital.

The hearing was reset for August 28, 1997. Dr. Sadler appeared on that date with her counsel and again requested a postponement, which was granted as part of an agreement that the parties enter into a Consent Order relating to the further conduct of the hearing. A Consent Order executed on September 6, 1997, required Dr. Sadler within ten days after receipt of the notice of the new hearing date to assert any alleged deficiency in or objection to any procedural aspect of the case. Also, the parties agreed to submit a memorandum setting forth the procedural and substantive issues to be presented at the hearing. Dr. Sadler did not assert any objection to any procedural aspect of the case and failed to file the memorandum with regard to the procedural and substantive issues to be presented to the hearing committee.

The hearing committee that convened to review evidence on November 12, 1997, consisted of four members of the medical staff of the hospital who had no previous involvement or financial interests in the case. Indeed, at the outset of the hearing on November 12, 1997, Dr. Sadler and her attorney were asked whether there was any objection to any of the panel members based on a lack of impartiality and the re-

sponse was in the negative. The hearing which began on November 12, 1997, continued for eight more days spread over the next year, concluding on November 19, 1998.

The witnesses called by the hospital testified to the incidents recited in the above "Background" section of this opinion. Dr. Sadler testified on her own behalf and called six other witnesses.

One of those was Frederick Corder, M.D., the only physician on the MEC to vote against the imposition of proctoring and the recommendation that Dr. Sadler's privileges be terminated. He testified that he opposed the MEC recommendation because during his ten-year tenure on the MEC, no other physician had privileges revoked or suspended for either professional misbehavior or clinical incompetence.

Another witness called by Dr. Sadler was Willie Blair, M.D. who testified that he had not seen a similar instance where a physician was disciplined for the type of conduct attributable to Dr. Sadler.

Also Drs. Ahkter, Quraishi, Cox, and Werner, who were called as witnesses by the hospital, were cross-examined at length. During hours of cross-examination, significantly, Dr. Sadler did not question them about her efforts to create a managed care organization or whether they had directed others to "document and build a case" against her.

Dr. Sadler testified for several hours. Nevertheless, she never claimed that the complaints against her were part of a plan to destroy her newly formed managed care organization. Instead, she swore that the complaints about her performance were generated by nurses who resented difficult, "high intensity" medical assistance and medicaid patients that she brought to the hospital.

In closing argument before the hearing committee, counsel for Dr. Sadler asserted that "key players" at the hospital had targeted her and were "looking for reasons to get Dr. Sadler off their medical staff." Moreover, her counsel argued that the internal and outside peer reviews of Dr. Sadler's clinical

practices were flawed and did not prove any clinical incompetence.

On April 1, 1999, the hearing committee rendered its 30–page written report and recommendations to the hospital's Board of Directors. The report concisely stated the issue which they were convened to decide, to wit, "whether the recommendation of the MEC not to extend Dr. Sadler's provisional privileges was reasonable and appropriate." After the hearing, the committee painstakingly summarized the evidence that had been presented, it set forth the substance of what each of the thirteen witnesses who appeared at the hearing had testified. Its report continued with a review of the pertinent bylaws of the medical staff and concluded that the hospital had proved by a preponderance of the evidence that the MEC acted properly in refusing to extend Dr. Sadler's privileges beyond July 27, 1997, and imposing interim monitoring and proctoring. Finally, the hearing committee concluded that there was compelling evidence that Dr. Sadler "consistently disregarded hospital policies, was unprofessional in her dealings with hospital nurses and other staff, deviated from acceptable standards in her hospital record keeping and clinical practice, and ignored efforts by the hospital to bring her into compliance."

Pursuant to the bylaws of the medical staff, Dr. Sadler appealed to the Appellate Review Committee of the hospital's Board of Directors. After hearing oral arguments from the parties on June 10, 1999, the review committee recommended that the hospital's Board of Directors affirm the hearing committee's conclusions and recommendations. The Board of Directors accepted that recommendation on August 5, 1999.

## Discussion

### A. The Standard of Review

The parties agree that the bylaws of the medical staff of the hospital to which Dr. Sadler subscribed when she applied for privileges at the hospital constitute an enforceable contract between the hospital and Dr. Sadler. *See Volcjak v. Washing-*

*ton County Hosp.,* 124 Md.App. 481, 495–96, 723 A.2d 463 (1999); *Anne Arundel Gen. Hosp., Inc. v. O'Brien,* 49 Md. App. 362, 370, 432 A.2d 483 (1981). Those bylaws provide a process by which a physician may challenge a "corrective action" by the hospital, such as the termination of a physician's clinical privileges at the hospital. Dr. Sadler fully pursued the prescribed process. She appeared before a panel of members of the medical staff who had no involvement with her case and no financial interest in whether she should be retained as a member of the medical staff. She was represented by counsel, cross-examined witnesses under oath, called witnesses on her own behalf, offered documentary evidence, and she presented oral argument and post-hearing written memoranda to the hearing committee. Furthermore, when the hearing committee agreed with the recommendation of the MEC that her privileges at the hospital should be terminated, she exercised her right under the bylaws to have that decision reviewed by the Appellate Review Committee of the Board of Directors.

Dr. Sadler litigated the identical issues before the hearing committee and Appellate Review Committee, which she now has presented in the instant case. She alleged there and contends here that she was targeted for scrutiny by the "key players" at the hospital; that the evidence against her was gathered for improper motive; and that the actions taken against her were based on unreliable evidence. This being the case, the trial court ruled that as the actions taken in compliance with the bylaws of the medical staff were supported by substantial (although disputed) evidence, summary judgment in favor of the appellees was proper.

Thus, the trial court interpreted Md. Rule 2–501 [6] to mean that in this hospital credentialing dispute, the only material

---

**6.** Subsection (e) of Md. Rule 2–501 governing motions for summary judgment provides:

> **Entry of judgment.** The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in

facts which need be undisputed were those concerning the substantial compliance of the proceedings with the bylaws and substantial evidence (albeit disputed) to support the result.

■ We have suggested that credentialing decisions made after proceedings conducted in accordance with bylaws governing a physician's clinical privileges at a hospital are entitled to deference by a court in reviewing such decisions. *Volcjak,* 124 Md.App. at 497, 723 A.2d 463; *Anne Arundel Gen. Hosp.,* 49 Md.App. at 373–74, 432 A.2d 483. Courts in other jurisdictions have also held that judicial review of hospital credentialing decisions should be "very limited," *Rogers v. Columbia/HCA of Central Louisiana, Inc.,* 961 F.Supp. 960, 968 (W.D.La.1997); *Brinton v. IHC Hosps., Inc.,* 973 P.2d 956, 964 (Utah 1998); *Don Houston M.D., Inc. v. Intermountain Health Care, Inc.,* 933 P.2d 403, 408 (Utah Ct.App.1997); *Owens v. New Britain Gen. Hosp.,* 229 Conn. 592, 643 A.2d 233 (1994); *Zoneraich v. Overlook Hosp.,* 212 N.J.Super. 83, 514 A.2d 53, 56 (App.Div.1986). This demonstrates the "general unwillingness of courts to substitute their judgment on the merits for the professional judgment of medical and hospital officials with superior qualifications to make such decisions." *Mahmoodian v. United Hosp. Ctr., Inc.,* 185 W.Va. 59, 404 S.E.2d 750, 756 (1991). This philosophy has led to the adoption of a substantial evidence test or its equivalent as the standard for giving effect to hospital credentialing decisions. *Zoneraich,* 514 A.2d at 57; *Hongsathavij v. Queen of Angels/Hollywood Presbyterian Med. Ctr.,* 62 Cal.App.4th 1123, 73 Cal.Rptr.2d 695, 703 (1998); *Owens,* 643 A.2d at 241; *Miller v. Nat'l Med. Hosp.,* 124 Cal.App.3d 81, 84, 177 Cal. Rptr. 119 (1981); *Even v. Longmont United Hosp. Ass'n,* 629 P.2d 1100, 1103 (Colo.Ct.App.1981); *Straube v. Emanuel Lutheran Charity Bd.,* 287 Or. 375, 600 P.2d 381, 386–87 (1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980). We hold that the trial court properly adopted that test in entering the summary judgments in the case *sub judice.*

---

whose favor judgment is entered is entitled to a judgment as a matter of law . . . .

■ After review of the record, we further hold that there is substantial evidence therein to support the conclusions of the hearing committee and the Board of Directors that the imposition of proctoring and monitoring upon Dr. Sadler and the termination of her hospital privileges were reasonable and proper.

■ In addition to her contention that the evidence before the hearing committee to support the termination of her privileges was insufficient, Dr. Sadler makes other specific claims. Dr. Sadler contends that Article VI.A of the bylaws required that she be notified that her cases were being reviewed. She is wrong. Article VI provides for the imposition of corrective action by MEC and the notice required to the affected physician of that action. A proposed corrective action is initiated by the MEC or after a written request to the MEC. Significantly, the MEC may act on the proposal or direct that an investigation be performed. If MEC defers action to conduct a further investigation, the "affected practitioner is to be notified." It was not until April 14, 1996, when the PCC recommended proctoring, monitoring and the termination of Dr. Sadler's privileges that corrective action was proposed to the MEC by the PCC. The MEC initiated the corrective action less than two weeks later and Dr. Sadler was notified. Nothing in the bylaws precludes a committee such as the PCC from conducting an investigation before proposing a corrective action as was the case here. The trial court properly concluded that there was substantial evidence to support the hearing committee's finding that Dr. Sadler received timely notice of the corrective action from MEC.

■ Dr. Sadler also contends that notification to the National Practitioners Data Bank (NPDB)[7] that her clinical privileges would be proctored and monitored was premature.

---

7. The depository authorized by the Secretary of the Department of Health and Human Services ("HHS") to collect data reflecting the competence or lack thereof of physicians and other health care providers. *See* The Health Care Quality Improvement Act of 1986, 42 U.S.C.A. § 11101 *et seq.;* 45 C.F.R. 60.01 *et seq.*

She asserts that MEC had no power to impose proctoring and monitoring and that whatever action it took was not reportable to the NPDB. The bylaws of the medical staff and the regulations governing the NPDB refute Dr. Sadler's arguments.

Article VI.B.2. of the bylaws authorizes the MEC to impose an immediate suspension of clinical privileges. Furthermore, Article IV.D.10.c. of the bylaws, which governs provisional appointees to the medical staff, provides:

> During the provisional period, the individual's competence to exercise the clinical privileges granted and general conduct in the hospital shall be evaluated by the chairperson of the department or departments in which the individual has clinical privileges and by the relevant committees of the Medical Staff and Hospital. Provisional clinical privileges shall be adjusted to reflect clinical competence and ethics.

Clearly, the MEC had the power under these bylaws to impose proctoring and monitoring of Dr. Sadler's performance of surgery and management of maternity cases at the hospital.

██ As to the contention that notice to the NPDB of their corrective actions was premature, we disagree. Article VI. B.3. of the bylaws states that all summary actions of the MEC "remain in effect during the pendency of and the completion of the corrective action process and of the hearing and appellate review process." Manifestly, the proctoring and monitoring imposed by MEC on Dr. Sadler would last longer than 30 days. The hospital was required to report to the NPDB such a summary suspension. 42 U.S.C. § 11133(a)(1); 45 C.F.R. § 60.9(a)(1)(i). *See also,* the NPDB Handbook published by HHS, pp. E–18–19 (summary suspensions prior to the exhaustion of internal administrative appeals are final for purposes of reporting and the imposition of proctoring for more than 30 days is an action deemed reportable.) There was substantial evidence presented to the hearing committee to justify its conclusion that the hospital had a duty to report and was justified in reporting the action of MEC. Furthermore, under 42 U.S.C.A. § 11137(c) and of the Courts and Judicial Pro-

ceedings, § 5-638(b) of the Maryland Code Annotated (1973, 1998 Repl.Vol., 2001 Supp.), Dr. Goldman and DHC are immune from civil liability for reporting the suspension of Dr. Sadler's privileges for more than 30 days to a professional review body such as the NPDB unless there is "knowledge of the falsity of the information contained in the report." Substantial evidence justified the hearing committee's decision that the report was true.

### Conclusion

The medical staff bylaws create a contract between the hospital and its medical staff with regard to all aspects of credentialing the physicians and the medical staff. Dr. Sadler agreed to subject her clinical performance to the hospital's quality assurance program and the resolution of any disputes as to credentialing to the process provided by the bylaws.

The hearing committee and the hospital's Board of Directors found that allegations made by Dr. Sadler, identical to the claims that she makes in the case *sub judice*, were without merit. We agree with the trial court that those decisions were supported by substantial evidence evaluated under a process set up by the bylaws that guaranteed Dr. Sadler a fair hearing.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**