Filed 1/31/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| RONALD ZANNINI et al., | B302404 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC614661) |
| v. | |
| MARK A. LIKER, M.D., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frank J. Johnson, Judge. Affirmed.

Gordon Edelstein Krepack Grant Felton & Goldstein, Roger L. Gordon; Law Office of Joshua M. Merliss and Joshua M. Merliss for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson; Packer, O'Leary & Corson, Robert B. Packer and Paul M. Corson for Defendant and Respondent.

———————————

# INTRODUCTION

In early 2015, appellant and plaintiff Ronald Zannini began to experience weakness in his left arm.  Mr. Zannini consulted a neurologist, who referred him to respondent neurosurgeon Mark A. Liker, M.D.  Dr. Liker diagnosed cervical myelopathy (cervical spinal cord dysfunction) and recommended surgery to relieve pressure on Mr. Zannini's cervical spine.  Dr. Liker performed the surgery on March 25, 2015.  Eleven days later, Mr. Zannini experienced paralysis of his arms and legs.  He was taken by ambulance to the emergency room and diagnosed with a cervical epidural hematoma – a blood clot.  He underwent emergency surgery six hours after arriving at the emergency room.  Despite the surgery, he ended up partially quadriplegic, able, after years of physical and occupational therapy, only to breathe on his own and move his left hand to operate his wheelchair.

Mr. Zannini believed his partial quadriplegia was due to a delay in the diagnosis and treatment of the epidural hematoma.  He attributed the delay to medical malpractice.  He and his spouse, Bonnie Zannini, filed a complaint against Dr. Liker and others involved in his treatment in the emergency room.  Plaintiffs' theory was that the emergency surgery should have taken place sooner than six hours after Mr. Zannini's arrival at the emergency room because time was of the essence in removing the blood clot.  At trial, he attributed the delay solely to Dr. Liker, who consulted with the emergency room and on-call physicians, but did not perform the emergency surgery.  After a multi-day trial, the jury rendered a verdict in favor of Dr. Liker and against the Zanninis.

The Zanninis appeal the judgment against them.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *March 25, 2015 Surgery*

In early 2015, Ronald Zannini (Mr. Zannini) was a retired musician and general contractor in his mid-70s living with his spouse Bonnie Zannini (Mrs. Zannini) in Valencia, California.  He began to notice weakness in his left arm and could not lift weight with it.  He consulted a neurologist who examined him and ordered magnetic resonance imaging (MRI) of his spine.  After reviewing the images, the neurologist referred Mr. Zannini to a neurosurgeon, respondent Mark Liker, M.D.  Dr. Liker examined Mr. Zannini on February 2 and 9, 2015 and reviewed the MRI.  He diagnosed cervical myelopathy or spine dysfunction, and recommended cervical spine surgery to correct degeneration of the spine, which had occurred with age.

Mr. Zannini underwent the surgery on March 25, 2015.  The surgery was uneventful and two days later, Mr. Zannini was discharged from the hospital.  The surgery involved placing hardware in Mr. Zannini's neck to stabilize it.  Dr. Liker instructed Mr. Zannini to wear a cervical collar at all times except when bathing or sleeping.  Mr. Zannini followed the instructions religiously.  Nevertheless, once at home, Mr. Zannini noticed that now both of his arms were weak and he was experiencing severe neck pain.  So, on March 28, 2015, he went to the emergency room where he met with Dr. Liker who ordered an MRI of the cervical area.  The imaging showed no abnormalities – no movement of the hardware that had been placed in Mr. Zannini's spine, no blood clot, no fluid, nothing that would be the likely source of Mr. Zannini's continued weakness and pain.  Dr. Liker prescribed a steroid and advised Mr. Zannini to take medication for the pain.  Mr. Zannini complied.  Dr. Liker told

3

him the use of his arms would probably come back. Mr. Zannini settled in for the healing process to begin.

On March 30, 2015, Mr. Zannini was still experiencing excruciating pain and both arms were bothering him. He had a previously scheduled appointment with Dr. Liker that day. Dr. Liker told him the steroid was to calm down nerves in the painful area. Between March 30 and April 5, 2015, Mr. Zannini remained mostly bedridden in pain.

B.      *April 5, 2015 Paralysis and Emergency Room Treatment*

In the afternoon of April 5, 2015, Easter Sunday, Mr. Zannini took a shower with the assistance of his wife. As instructed, he did not wear the cervical collar in the shower. He got out of the shower and went into his bedroom, where he sat on the bed and began to apply lotion to his legs. All of a sudden, Mr. Zannini felt a warmth flow through his body and then he could not move his legs or arms. His wife noticed a ripple travel through his body. Mr. Zannini was paralyzed. "I can't feel my body." Mrs. Zannini called 911 and the paramedics came within 10 minutes of the call. They took Mr. Zannini by ambulance to the emergency room at Henry Mayo Medical Center in Newhall, where his initial surgery had been performed 11 days earlier. He arrived in the emergency room at 5:25 p.m.

Dr. Elaine Lee, the emergency room physician, was notified that an acutely paralyzed patient was en route via ambulance. Upon arrival, Mr. Zannini was seriously compromised. He was acutely paralyzed with no motor strength and had no sensation from the nipple line down. He had no anal reflex. He had a priapism(an involuntary erection), a slow heartbeat, and low blood pressure. Dr. Lee knew time is of the essence in every patient who is paralyzed. At 5:26 p.m. she called a Code Trauma,

4

which activated the trauma team and gave priority to Mr. Zannini for radiology studies. At 5:39 p.m., she paged Dr. Liker and Dr. Martin Mortazavi, the on-call neurosurgeon. Because Dr. Mortazavi and Dr. Liker were members of the same neurosurgical medical practice and Dr. Liker coincidentally happened to be at the hospital seeing other patients, Dr. Liker told Dr. Mortazavi he would handle the page and immediately went to the emergency room.

Dr. Liker consulted with Dr. Lee, who, as the emergency room physician, was responsible for managing Mr. Zannini's care. On the recommendation of Dr. Ranbir Singh, the trauma surgeon, Dr. Lee immediately ordered CT scans of the head, neck, chest, and abdomen for the purpose of diagnosing the cause of the paralysis. Dr. Liker also recommended adding a CT angiogram to determine whether any blood vessels to and of the brain were blocked. At 5:45 p.m. Mr. Zannini was taken to the CT scanning suite which was adjacent to the emergency room. Dr. Liker and Dr. Lee went into the CT scanning suite to review the scans, which were available at 6:00 p.m. Dr. Liker spoke as well with the radiologist. The CT scans, which best display metal hardware and bone mass in a patient's body, were to rule out migration of hardware or movement of the bones. The CT scans showed nothing amiss.

The process by which physicians arrive at a diagnosis for symptoms is called differential diagnosis. That is, possible diagnoses are considered and methodically ruled out to narrow the range of possible causes. The standard is to rule out the worst-case scenario first. A useful differential diagnosis considers the conditions that are most likely and the conditions most amenable to treatment. Dr. Liker was pondering a stroke of

5

the brain or spinal cord or a bleed as the top causes of the paralysis. He knew whatever the cause, it was going to be a "very, very rare event." He knew that the prognosis for recovery from a hematoma compressing the spinal code depends on the type of hematoma and the duration of time and the acuity of the event. Once the problem is identified, it becomes a surgical emergency because if the hematoma is not removed, the problem could get potentially worse. Based on Mr. Zannini's condition upon arrival at the emergency room, Dr. Liker believed the damage was "already done"; he did not foresee any meaningful recovery with surgery. But that expectation did not preclude surgery, if a hematoma was diagnosed. Dr. Singh examined Mr. Zannini, reviewed the CT scans, and ruled out trauma as the cause of the paralysis. His consultation as to trauma ended at that point.

A Code Neuro was then called which enabled a consultation with the on-call neurologist, Dr. Schultz, who did not think the brain was involved. Dr. Liker wanted to discuss whether a stroke was causing the paralysis. Based on Dr. Schultz's telephone consultation, however, the Code Neuro was cancelled. Dr. Schultz recommended an MRI of the thoracic and cervical spine. Dr. Liker recommended an MRI of the cervical spine as well. The MRI is the gold standard for showing soft tissues of the spinal canal and whether there is hemorrhaging, infection, swelling, or anything pressing on the soft tissues of the spinal cord. It is used to diagnose tumors, blood clots and hematomas. Dr. Lee ordered the MRI scans at 6:11 p.m. The plan was to determine if there was pathology that could be corrected by surgery.

The MRI scanner was located in a separate building which required medical staff to transport Mr. Zannini out of the

6

emergency room, across a street. and into another building about 300 yards away.  The MRI team had to be summoned to the hospital. The MRI technician arrived at 6:50 p.m.

In the meantime, Mr. Zannini was in the emergency room experiencing, in addition to his paralysis, difficulty breathing, severely low heartbeat, and low blood pressure.  He had one-on-one nursing care.  Dr. Lee prescribed Levophed, a medication to stabilize blood pressure.  The medication was infused into Mr. Zannini and very gradually began to take effect.  However, the MRI technicians could not take Mr. Zannini to the MRI suite and put him into the scanner unless he was medically stable; to remain stable, Mr. Zannini needed the Levophed infusion during the MRI.  The Levophed pump had to be MRI compatible.  The hospital did not have a compatible pump readily available.  By the time hospital staff located a compatible pump and Mr. Zannini was stabilized, it was 7:40 p.m. when he was finally transported to the MRI scanner.

While Dr. Lee was trying to stabilize Mr. Zannini's blood pressure and staff looked for a compatible pump, Dr. Liker called Dr. Mortazavi at 6:00 pm. to brief him on what was happening.  Dr. Liker told Mr. Mortazavi to be ready for the results of the MRI.  He stated that his differential diagnoses included a spinal cord stroke or a bleed compressing the spinal cord causing paralysis.

Dr. Liker also spoke to Mrs. Zannini from about 6:40 p.m. to 7:00 p.m.  He told her that the doctors were trying to arrive at a diagnosis for Mr. Zannini's paralysis.  He himself was confused by the symptoms and said he thought Mr. Zannini had had some sort of stroke.  He told Mrs. Zannini that this was a very serious event and he did not know how it was going to play out.  He

7

explained the MRI would help rule out possible incorrect diagnoses and arrive at a correct one.  He also told Mrs. Zannini that if surgery were needed that night, he would not be the one to perform it as he was scheduled to board an out of town flight that night at 11:45 p.m.  (She testified that he had previously told her at one of Mr. Zannini's visits that he was going out of town.)  He told Mrs. Zannini that his associate Dr. Mortazavi would do any necessary surgery.  As Dr. Mortazavi was the on-call neurosurgeon, hospital protocol dictated that he had to arrive at the hospital within 30 minutes of being called in to operate.

Dr. Liker left the hospital at around 7:17 p.m. to catch his flight.  The MRI was a series of scans of the thoracic and cervical areas of Mr. Zannini's spine.  The first images began to emerge from the scanner around 8:10 p.m.  The first images showed a blood clot.  Neuroradiologist Dr. Goldman read the complete set of scans and reported his results to Dr. Lee in the emergency room at 9:38 p.m.  He also called Dr. Mortazavi with the results.  He did not call Dr. Liker.  The MRI showed a blood clot was pressing on Mr. Zannini's cervical spine and was the likely cause of the paralysis.  Formation of such a blood clot, a cervical epidural hematoma, 11 days of the initial surgery was, as Dr. Liker knew, a "very, very rare occurrence."  At 9:39 p.m., once notified of the result of the scans, Dr. Mortazavi agreed to go immediately to the hospital to perform emergency surgery.

Although Dr. Liker had left the hospital at 7:17 p.m., he remained in contact by text with Dr. Mortazavi and Dr. Parham Yashar, another medical associate who was a vascular neurosurgeon.  When Dr. Mortazavi was notified of the neuroradiologist's findings at 9:38 p.m., he made the decision to do the emergency surgery on Mr. Zannini.  He relayed his

8

decision to Dr. Liker. He, Dr. Liker, and Dr. Yashar reviewed the MRI scans on their phones. Dr. Mortazavi called the operating room and the emergency room and told the staff to prep Mr. Zannini for surgery and to be prepared to start surgery at 10:00 p.m. when he arrived. Dr. Mortazavi received a response from the hospital that the operating room was not going to be available for Mr. Zannini's emergency surgery until 11:00 p.m. because there was another operation in progress that would not be finished until then. Mr. Mortazavi asked staff to bring in a second operating room team; he was told that would take even longer.

Both Dr. Liker and Dr. Mortazavi separately called the hospital to no avail to try to expedite the surgery. Dr. Liker called Mrs. Zannini to tell her that Dr. Mortazavi had decided on surgery. Dr. Mortazavi called the hospital and told staff to have Mr. Zannini in the operating room ready to proceed when he arrived.

Now that he knew he could not start surgery until 11:00 p.m., Dr. Mortazavi drove a little more slowly and arrived at the hospital at around 10:50 p.m. He was dismayed to find that Mr. Zannini was still in the emergency room, not yet in the operating room as he had requested. He yelled at the staff. Eventually Mr. Zannini was taken to the operating room where Dr. Mortazavi commenced surgery at 11:35 p.m. and removed the blood clot.

Before beginning the surgery, Dr. Mortazavi told Mrs. Zannini that he thought the chances of Mr. Zannini recovering his lost motor function were low. He said the goal of the surgery was to save Mr. Zannini's life because of the location of the bleeding, his problems breathing, and his low blood pressure.

9

The surgery started six hours after Mr. Zannini's arrival at the emergency room.

C.    *Dr. Liker's Testimony*

Dr. Liker testified that even if he had not left at 7:17 p.m., he would have not commenced the surgery before getting the results of the complete MRI series, which were not available until 9:30 p.m.  The hematoma was a "very, very rare occurrence" in his experience.  He would have been looking for some sort of anomaly that would have caused the bleed.  Sometimes hematomas extend under the bones and the bone needs to be removed as well as the hematoma.  He needed the complete MRI series to get that information.

The suddenness of the injury is one of the most important indictors of the eventual status of the patient and the ability of the patient to recover.

Dr. Liker testified that it was such a "very, very rare event" that he did not know anything that he could have done differently that would have changed the outcome.  He was surprised by the diagnosis coming two weeks after the surgery, especially because the intervening MRI made it much less likely that the epidural hematoma could be the cause of the problem.  He had never read about a post-surgical bleed 11 days after surgery nor had he ever heard other doctors talk about such a thing.  He does 500 surgeries a year and had never seen this.  It was extremely rare.

His examination of Mr. Zannini in the emergency room was equivocal in that some tests were consistent with damage to the spinal cord and some were not.  He acknowledged some fibers in the cord may have survived, but given the complexity of the situation, he concluded Mr. Zannini was in spinal shock, the

10

spinal cord was significantly damaged, the cord would not repair itself, and recovery would likely involve only a minimal change. Because of the rare nature of the event, he needed to determine if there was a blood vessel or an abnormal triangle of blood vessels causing the bleed. He believed it would have been below the standard of care to start surgery without having reviewed and interpreted the complete MRI series.

D.    *Post-Operative Prognosis*

The removal of the blood clot did not reverse Mr. Zannini's paralysis. He remains partially paralyzed from the chest down. After years of in-patient rehabilitative therapy and several hospitalizations for complications arising from the quadriplegia, Mr. Zannini can breathe on his own and move fingers of his left hand to operate a wheelchair. He lives at home with his spouse and requires 24-hour healthcare.

E.    *The Complaint and Trial*

On March 22, 2016, the Zanninis filed a complaint in the Los Angeles Superior Court against Dr. Liker, Dr. Lee, Dr. Singh, Dr. Mortazavi, California Neurological Institute Inc., Santa Clarita Emergency Medical Group, Inc., Henry Mayo Newhall Community Medical Center, and Dr. Liker's medical practice, Neurosurgical Associates of Los Angeles, Inc. The complaint alleged medical malpractice as the cause of Mr. Zannini's partial quadriplegia. Specifically, the complaint alleged "defendants failed to timely diagnose and treat a spinal subdural hematoma resulting in plaintiff Ronald Zannini becoming quadriplegic." Mr. Zannini sued for general and special damages. Mrs. Zannini sued for loss of consortium.

Judgments dismissing all defendants except Dr. Liker were eventually entered by the trial court as a result of motions for dismissal, nonsuit, or summary judgment. On July 16, 2019, trial commenced as to Dr. Liker only. Plaintiffs' theory was that Dr. Liker was negligent when he left the hospital at 7:17 p.m. to catch his flight instead of staying at the hospital, reviewing the MRI as it began to emerge from the scanner at 8:10 p.m., and commencing surgery shortly after 8:10 p.m. when the operating room was still available. Plaintiffs argued that when Dr. Liker left the hospital, he caused the surgery to be delayed until 11:30 p.m., too late to reverse Mr. Zannini's paralysis. The jury returned a verdict in favor of Dr. Liker and against the Zanninis.

F. *Expert Testimony*

Both sides presented expert testimony to the jury. All the experts agreed that there was no malpractice surrounding the initial cervical spine surgery performed by Dr. Liker on March 25, 2015. They agreed time was of the essence in determining the cause of Mr. Zannini's paralysis in order to obtain the best treatment result. Plaintiffs' experts also agreed they could not say whether Mr. Zannini's prognosis would have been appreciably different had the surgery occurred earlier in the evening. No expert could quantify the degree to which the patient would have been better off in the absence of the alleged delay in getting to the operating room. And all the experts agreed that no other individual that night, physician or staff member, committed professional malpractice of any kind. The sole issue at trial was whether Dr. Liker's decision to leave at 7:17 p.m. constituted medical negligence because it unduly delayed the emergency surgery.

12

Plaintiffs' experts were Dr. Christopher Taylor and Dr. Barry Pressman. Dr. Pressman, a neuroradiologist at Cedar Sinai Medical Center, reviewed the MRIs from March 28, 2015 and April 5, 2015 and opined that something happened between those dates to create pressure on the spinal cord, which looked "pancaked" from the pressure. He said that he had seen worse but the compression was "pretty significant" on April 5. From the images taken March 28, he saw no evidence of spinal cord compression.

Dr. Pressman specifically noted that he was not giving an opinion about what Dr. Liker should or should not have done in the case. He testified he could neither quantify the degree of recovery statistically nor "put any numbers" on the prognosis. He testified that blood pressure which cannot be supported in the absence of intravenous Levophed due to spinal shock is a poor prognostic sign, meaning there is a high likelihood of more damage to the cord. He opined that generally the less time the problem is present, the more likely there is some degree of recovery. The records he reviewed noted the patient moved his toes on April 5, 2015. The more function that is present, the better the prognosis.

Plaintiffs' other expert was neurosurgeon Dr. Christopher Taylor. He also reviewed the medical records and imaging and agreed with Dr. Liker's initial finding that Mr. Zannini's dysfunction was due to age and degeneration as opposed to trauma or tumor. Dr. Taylor opined it was "completely appropriate" for Dr. Liker to order an MRI of the neck on April 5, 2015 as it is better to "have a road map before you open the patient up." He opined it was important to get the pressure off the spine as soon as reasonably possible because this was a

13

neurological medical emergency where every minute counted. The concern has to do with whether there is a chance of recovery in the situation, which is related to the severity of the compression and how quickly the pressure on the spinal cord can be relieved. Dr. Taylor agreed with Dr. Pressman that Dr. Liker's observation that Mr. Zannini could move his toes was a sign it was not a complete spinal cord injury.

Dr. Taylor opined that by 6:30 p.m., Dr. Liker knew or should have known this was most likely an acute surgical emergency and an MRI would be necessary to confirm that surgical treatment would be indicated. In his opinion, Dr. Liker should have stayed with Mr. Zannini and made sure that someone capable of performing the surgery was immediately available when the study was done and interpreted. Dr. Taylor concluded that Dr. Liker did not meet the standard of care because he did not ensure that the surgery was done "earlier." Had it been done earlier, "Mr. Zannini's condition more likely than not would be significantly better than it is today." He estimated that Dr. Liker should have been able to diagnose the condition by 7:40 p.m. that evening, allowing for time to complete the MRI after the order was placed at 6:30 p.m. He acknowledged that his timeline did not take into account delays associated with the blood pressure problem, the incompatibility of the pump, and a kink in the infusion line during the MRI itself. Nor did he fault anyone for not reporting the results of the MRI until 9:30 p.m. He noted that he believed Dr. Liker acted within the standard of care in treating Mr. Zannini up to April 5, 2015.

14

Dr. Taylor noted he has never read about an 11-day post-operative bleed creating an epidural hematoma. Most of these incidents occur within the first 12 to 24 hours after the surgery or even sooner, when the patient is still generally in the hospital when the symptoms appear. He had no criticism of anyone else who cared for Mr. Zannini on April 5, 2015 except Dr. Liker. He agreed with Dr. Pressman that the imaging showed that when Mr. Zannini arrived at the emergency room, the spinal cord had pancaked and he was already in spinal shock, a poor prognostic sign for eventual recovery. He opined Mr. Zannini's symptoms of no bladder control, no anal reflex, no motor function in any extremity, and an involuntary erection were "suggestive" of a spinal cord that had been "severely insulted with a low probability of neurological recovery even if surgery was done immediately." Like Dr. Pressman, Dr. Taylor could not quantity how much better Mr. Zannini would have been with earlier surgery. He could not say Mr. Zannini would not have needed the same post-operative care with earlier intervention.

Dr. Taylor opined Dr. Liker "was involved in [Mr. Zannini's] care up to a point" in that he had "examined him at least twice" by 6:30 p.m. Dr. Taylor testified a reasonably prudent neurosurgeon would have 1) viewed the initial MRI images at 8:10 p.m. which clearly showed a hematoma, 2) ruled out alternate causes other than the epidural hematoma at 8:10 p.m., and 3) immediately secured an operating room. Dr. Taylor concluded that because Dr. Liker did not do this, he did not meet the standard of care. Dr. Taylor testified it would have been better to do the surgery at 8:30 p.m. rather than 11:30 p.m.

15

Presenting a different opinion of the standard of care was Dr. Liker's expert neurosurgeon Dr. Howard Tung. Dr. Tung agreed with the other experts that Dr. Liker complied with the standard of care in recommending and performing the initial spine surgery on March 25, 2015 and in providing post-operative care. He opined the standard of care in California requires confirmation by MRI of the diagnosis of epidural hematoma affecting the spinal cord before taking a patient to the operating room for evacuation of an epidural hematoma. The entire study must be completed because the surgeon would want to see the full extent of the problem, which is not apparent from the initial images that emerge. The neurosurgeon would want to see the entire spine visualized. He also testified that if a neurosurgeon is called in to consult because a spinal cord compression is in the differential diagnosis, the neurosurgeon does not take over the overall care of the patient in the emergency room. Dr. Tung testified that it would be unusual for a reasonable and prudent neurosurgeon to accompany a patient to the MRI and it is not called for by the standard of care.

Most hematomas ever reported in any study usually form within 24 to 48 hours of surgery. Mr. Zannini was already past that window which meant the physicians were "talking about something very, very remote." That there was an intervening normal MRI on March 28, 2015 also affected the differential diagnosis on April 5, 2015. This made the patient's presentation on April 5 acute, unusual and "very, very rare. It's more rare than getting struck by lightning." Dr. Tung asked, "If you already know you've ruled out . . . 99.99 percent of all epidurals that are going to occur with an M.R.I. three days out, now why

would I be thinking about the .0001 percent? [¶] . . . [¶] Now you have to think about other things . . . that can occur."

Dr. Tung noted there was no evidence Mr. Zannini's condition improved from the time he arrived at the emergency room until the time he was taken to the operating room. He opined that the most important determination in the prognosis is the patient's presenting neurological status or function. He scored 0 out of 5 on movement which was not a good prognosis. None of the examiners found sensation and their evaluations were all essentially consistent with one another, that is, Mr. Zannini was a complete or near complete quadriplegic.

Dr. Tung concluded, within a reasonable medical probability, that if the surgery had commenced at 7:30 p.m., the outcome would not have been different. He opined Dr. Liker complied with the standard of care by telling the family that he was departing the hospital and advising them that Mr. Zannini would be in the care of another neurosurgeon who was fully aware of his status and ready to do timely surgery if it was indicated. There is no standard that dictates that a neurosurgeon has to stay on the premises of a hospital to wait and see if surgery is indicated. It did not become a surgical emergency until 9:30 p.m. when the MRI results were communicated to Dr. Mortazavi and Dr. Lee. After the results were communicated, an operating room was secured without delay.

G.    *The Verdict*

In its deliberations, the jury considered a special verdict form prepared by the parties and approved by the court. The special verdict form included a list of questions to be answered by the jury in the order in which they were presented. After each

17

question, the special verdict form instructed the jury how and whether to proceed to the next question. The first question on the special verdict form asked the jury whether Dr. Liker was medically negligent in his care and treatment of Mr. Zannini. If the answer was "no," the jury was instructed to stop, answer no further questions, and have the presiding juror sign and date the form. If the answer was "yes," the jury was instructed to proceed to the next question. There were four questions in all. The jury answered the first question "no," finding Dr. Liker not negligent. As instructed, it then did not answer any of the other questions, which pertained to causation and damages.

The trial court entered judgment in favor of Dr. Liker and against the Zanninis on September 4, 2019. The judgment was amended on November 18, 2019, to add a cost award in favor of Dr. Liker. This timely appeal followed.

## DISCUSSION

At the outset, it is important to note plaintiffs do not argue on appeal that the evidence was insufficient to support the verdict. Instead, they challenge the trial court's decisions to give and refuse certain instructions to the jury.

A.      *Standard of Review*

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) A proposed instruction

that is irrelevant, confusing, incomplete, or misleading need not be given.  (*Solgaard v. Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 370.)  A court may refuse an instruction when the legal point is adequately covered by other instructions given.  (*Arato v. Avedon* (1993) 5 Cal.4th 1172, 1189, fn. 11.)

Instructional error must be prejudicial.  This means it must be reasonably probable that the complaining party would have obtained a more favorable result in the absence of the error.  (*Soule, supra*, 8 Cal.4th at pp. 570, 573–574; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983.)  The reviewing court should consider not only the nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury but the likelihood of actual prejudice as reflected in the individual trial record, taking into account (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.  (*Soule*, at pp. 580–581.)

The propriety of giving a jury instruction is reviewed de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

B.    *The Trial Court Did Not Err in Declining to Instruct the Jury with CACI 509 (Abandonment of Patient) as the Instruction Was Not Supported by Substantial Evidence*

Plaintiffs asked the court to instruct the jury with CACI 509 (Abandonment of Patient).  That instruction, as proposed by plaintiffs read: "Ronald Zannini claims Mark A. Liker, M.D., was negligent because he did not give Ronald Zannini enough notice before withdrawing from the case.  To succeed, Ronald Zannini must prove both of the following:  [¶]  1. That Mark A. Liker, M.D. withdrew from Ronald Zannini's care and treatment; and [¶]  2. That Mark A. Liker, M.D. did not provide sufficient notice

19

for Ronald Zannini to obtain another medical practitioner. [¶] However, Mark A. Liker, M.D., was not negligent if he proves that Ronald Zannini consented to the withdrawal or declined further medical care."

In settling the instructions, the trial court observed that the evidence did not support the notion that Dr. Liker failed to give sufficient notice that he was not going to be available to do the surgery. Both parties immediately agreed the court was correct and the case was not about Dr. Liker giving insufficient notice. The court then stated: "I think we could give [CACI] 509, but we need to add some language that recognizes that good faith efforts to obtain alternative medical assistance are to be credited." The court stated: "We need to instruct a jury on everything that they conceivably might find to be the facts. I'm not saying anybody should or should not find one way or the other on Instruction 509, and neither am I saying they should find one way or the other on the proposed modification that I just mentioned. But both have some support in the facts. . . . [¶] But I think the court's obligation at this point is to instruct the jury on any plausible interpretation of the facts that might occur during their deliberations. And, you know, perhaps they'll conclude there was abandonment. [¶] Perhaps they'll conclude that the efforts that were made to secure additional medical treatment were sufficient, and I just think it needs to be acknowledged. I'll just tell you flat out, I'm not giving this instruction unless it is modified because it's too draconian, and it leaves the jury almost no choice but to vote in a particular way, and I don't think that's correct." When plaintiffs' counsel suggested that the term "secure the presence" meant that Dr. Liker had to remain at the hospital until Dr. Mortazavi

20

physically arrived ("To secure the presence is the whole key. The body has to be there. You can't do a handoff on a promise."), the court disagreed. "Securing the presence does not mean that in this case Dr. Liker would have to go find Dr. Mortazavi, drive him to the hospital, plant him in the operating room, and then, okay, now, I can leave. It doesn't mean that. What it does mean is going to be up to the jury. [¶] Secure the presence could mean it takes reasonable steps to obtain an alternative medical treatment or it could mean . . . they had to wait until he actually shows up. That's fine. You can argue that. But there's nothing in that case [*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123 (*Hongsathavij*)] that says Dr. A has to wait until Dr. B is physically at his side. There's nothing in the case that says that." The court asked both counsel to come up with an instruction that recognized all inferences that could be drawn from the evidence either way without referring to issues of notice.

Dr. Liker presented a modification to be added to CACI 509. The modification read: "Efforts by Dr. Liker to secure a substitute physician can be considered when determining whether Dr. Liker was medically negligent or acting reasonably under the circumstances." Plaintiffs opposed Dr. Liker's proposed language because Dr. Liker "walked away and did not secure the presence of a person of similar capabilities as himself to be there in a timely manner." The court reiterated that the law did not require that Dr. Liker remain at the hospital until his replacement physically arrived. Plaintiffs submitted Special Instruction No. 1, which was still focused on inadequate notice. Citing *Hongsathavij*, Special Instruction No. 1 read: "A physician cannot just walk away from a patient after accepting the patient

21

for treatment. . . . In the absence of the patient's consent, the physician must notify the patient he is withdrawing and allow ample opportunity to secure the presence of another physician." Again stating that the case was not about notice, the trial court refused to give Special Instruction No. 1 and adhered to its prior refusal to give CACI 509 as initially proposed. The court adopted Dr. Liker's argument that according to plaintiffs' standard of care expert, Dr. Taylor, Dr. Liker was medically negligent for leaving the hospital before Dr. Mortazavi was physically present. "If the jury believes that, that may be medical negligence." Dr. Liker argued that the abandonment instruction did not apply; instead the instruction on medical negligence and the standard of care covered the argument plaintiffs wanted to make to the jury.

Plaintiffs now argue that the court erred when it did not give CACI 509. We disagree. CACI 509 is based on the general proposition that "a physician who abandons a patient may do so 'only . . . after due notice, and an ample opportunity afforded to secure the presence of other medical attendance.' " (*Payton v. Weaver* (1982) 131 Cal.App.3d 38, 45. Indeed, a "physician cannot just walk away from a patient after accepting the patient for treatment. . . . In the absence of the patient's consent, the physician must notify the patient he is withdrawing and allow ample opportunity to secure the presence of another physician." (*Hongsathavij*, *supra*, 62 Cal.App.4th at p. 1138.)

*Hongsathavij* is the quintessential case of abandonment of patient. There, Dr. Hongsathavij, the on-call doctor for labor and delivery, accepted for treatment an emergency room high-risk patient in premature labor and admitted her to the hospital as his patient. Upon learning later that the patient was not one for whom Los Angeles County would pay his fees, Dr. Hongsathavij

22

refused to issue any orders for her care or treatment. He told the nursing director on duty that he did not want to take care of the patient and his insurance would not allow him to do so. Nursing staff had to call another physician to the hospital to treat the patient. (*Hongsathavij, supra*, 62 Cal.App.4th at p. 1131–1132.) The court of appeal repeated "well-accepted principles," to wit, that a "physician cannot just walk away from a patient after accepting the patient for treatment"; a "physician cannot withdraw treatment from a patient without due notice and an ample opportunity afforded to secure the presence of another medical attendant"; and in "the absence of the patient's consent, the physician must notify the patient he is withdrawing and allow ample opportunity to secure the presence of another physician." (*Id.* at p. 1138; *Payton v. Weaver, supra*, 131 Cal.App.3d at p. 45 [no abandonment where physician gave sufficient notice to patient that he would no longer treat her and provided patient with names and telephone numbers of alternate dialysis providers].) Given the evidence that Dr. Hongsathavij admitted the patient as his own, refused to provide care, and did not give notice to the patient that he would not treat her, the court there found "patient abandonment." (*Hongsathavij,* at p. 1139.)

Here, the undisputed facts are that Dr. Liker consulted with Dr. Lee, the emergency room physician managing Mr. Zannini's care; Dr. Liker did not take over the patient's care; Dr. Liker reminded Mrs. Zannini he would not be available to do emergency surgery if it was needed, but his associate and on-call physician Dr. Mortazavi would be available; Dr. Liker made Dr. Mortazavi aware of the patient's circumstances, pending tests, and possible diagnoses; and Dr. Liker remained available to

23

discuss with Dr. Mortazavi possible diagnoses and treatment after Dr. Mortazavi received the MRI results. When Dr. Liker left the premises, there was a plan in place for his treatment by Dr. Lee and Dr. Mortazavi. There was no evidence of abandonment of patient as contemplated by CACI 509. The trial court was correct in declining to give the instruction.[1]

Plaintiffs argue that the standard of care required Dr. Liker to remain physically at the hospital until the next neurosurgeon physically arrived to take his place. The trial court did not disagree; it simply ruled abandonment did not occur as a matter of law just because Dr. Liker physically left the hospital before Dr. Mortazavi physically arrived.

We agree. Abandonment as a theory warrants CACI 509 only where there is evidence that the physician has accepted responsibility for the patient and then has withdrawn without giving enough notice to ensure timely continuity of treatment. The facts at trial did not support the notion that Dr. Liker took over Mr. Zannini's treatment and then withdrew without sufficient notice. No witness testified that Dr. Liker was in charge of Mr. Zannini's care in the emergency room. Dr. Lee testified she was managing the case. Dr. Mortazavi testified the

_____

[1] In addition to arguing that Dr. Liker had actually assumed responsibility for Mr. Zannini's care and then abandoned him, plaintiffs argued alternatively that because Dr. Liker had a pre-existing relationship with the patient, the standard of care required him to assume responsibility for Mr. Zannini's care and to remain at the hospital until another physician physically arrived to take over. The jury found no negligence and the evidence in support of the jury's verdict is not challenged on appeal.

24

emergency room physician is in charge until a diagnosis is made that requires surgery. Even plaintiffs' expert would only say that Dr. Liker "was involved in his care up to a point." The instruction was not warranted.

We also disagree with plaintiffs' contention that the court should have given CACI 509 because their theory of the case was not adequately covered by CACI 502 (Standard of Care for Medical Specialists). CACI 502 reads: "A neurosurgeon is negligent if he or she fails to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful neurosurgeons would use in similar circumstances. This level of skill, knowledge, and care is sometimes referred to as 'the standard of care.' [¶] You must determine the level of skill, knowledge, and care that other reasonably careful neurosurgeons would use in similar circumstances based only on the testimony of the expert witnesses, including Mark A. Liker, M.D., who have testified in this case."

First, plaintiffs requested CACI 502 as set out above without suggesting it be modified to be more specific as to Dr. Liker's early departure. Second, plaintiffs' theory was Dr. Liker never should have left the hospital under the dire circumstances before another neurosurgeon physically arrived to take over the patient's care. This iteration of the standard of care was supported by Dr. Taylor's expert testimony: "In my opinion he should have stayed with Mr. Zannini and made sure that he got the appropriate study, the M.R.I. or he should have made sure that someone capable of getting that study done, interpreting it and performing the surgery was immediately available." With this expert testimony, CACI 502 adequately permitted the jury, if it had been so inclined, to find medical negligence based upon Dr.

25

Liker's early departure.  If the jury believed Dr. Liker was negligent to hand off the patient's care to Dr. Mortazavi as he did, the jury could have so found.  Plaintiffs' theory of the case was adequately supported by the instructions as given.

C.     *CACI 411 (Reliance on the Good Conduct of Others) Did Not Prejudice Plaintiffs*

Plaintiffs contend that CACI 411 (Reliance on the Good Conduct of Others) should not have been read to the jury.  CACI 411 reads:  "Every person has a right to expect that every other person will use reasonable care, unless he or she knows, or should know, that the other person will not use reasonable care."  Plaintiffs' counsel initially stated they objected to the instruction and then told the court, "I'm not sure there's evidence of that.  But I can see their point."  The court then stated it would give the instruction and plaintiffs said nothing more.

Plaintiffs fail to show how they were prejudiced by the instruction.  Nor do they cite any legal authority for their proposition that the instruction was prejudicially given in error.  There was no evidence of misconduct or professional negligence by other personnel at the hospital that night upon which the delay in treatment could be blamed.  Indeed, no party even argued about the good or bad conduct of parties other than Dr. Liker.  No party argued that the conduct of third parties influenced Dr. Liker's decision to leave at 7:17 p.m.  Plaintiffs' position was that Dr. Liker alone was responsible for the delays in Mr. Zannini's treatment and the good conduct of others did not mitigate the delays caused by his premature departure from the hospital.  The defense likewise argued Dr. Liker's decision to depart when he did was consistent with the standard of care and did not cause a delay in treatment, given the inability to

26

responsibly diagnose the need for surgical intervention without Dr. Goldman's report interpreting the complete series of scans. The instruction did nothing to call attention to the conduct of third parties in such a way as to undermine plaintiffs' argument or to support the defense position. We find no error and no prejudice.

D.    *The Trial Court's Refusal to Give CACI 430 (Causation: Substantial Factor) and CACI 431 (Causation: Multiple Causes) and its Decision to Give Defense Special Instruction No. 2 Are Moot in Light of the Jury's Finding of No Negligence*

Plaintiffs also contend that the trial court erred when it declined to give two CACI instructions on causation. The court declined to give CACI 430, which reads: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." CACI 431 reads: "A person's negligence may combine with another factor to cause harm. If you find that Mark A. Liker, M.D.'s negligence was a substantial factor in causing Ronald Zannini's harm, then Mark A. Liker, M.D., is responsible for the harm. Mark A. Liker, M.D., cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing Ronald Zannini's harm."

Instead of giving these causation instructions, the trial court gave Defense Special Instruction No. 2: "You must decide whether the alleged negligent conduct of the defendants was a substantial factor that contributed to the injury complained of by

27

plaintiff. [¶] 1. To be 'substantial,' a 'factor' (alleged negligent conduct of defendant) must be something that actively contributes to the production of harm; [¶] 2. 'Substantial' means that the 'factor' is more than remote, trivial or merely possible in contributing to the harm; [¶] 3. A 'factor' is not 'substantial' if the harm complained of by plaintiff would have occurred without the conduct of the defendant. [¶] In making this determination, you must rely upon the testimony of the expert witnesses who expressed opinions as to whether there was a reasonable medical probability that the conduct of the defendants contributed to the injury complained of by Plaintiff."

We conclude these contentions are moot. Because the jury never found negligence, it did not answer the questions on the issue of causation. "Reversal is in order only if the error was a factor in the verdict it did reach." (*Wilkinson v. Southern Pac. Co.* (1964) 224 Cal.App.2d 478, 490; see *Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 273.) Determining the propriety of the instructions on causation will have no effect on the jury's finding that Dr. Liker was not negligent. There is no point in analyzing the challenged instructions and we decline to do so.

E.    *Plaintiffs' Challenge to CACI 506 (Alternative Methods of Care) Is Waived*

The trial court gave CACI 506 (Alternative Methods of Care) which reads: "A neurosurgeon is not necessarily negligent just because he or she chooses one medically accepted method of treatment or diagnosis and it turns out that another medically accepted method would have been a better choice." Plaintiffs contend there was no evidence of any "alternative method of treatment or diagnosis."

28

This contention is waived. Plaintiffs cite no legal authority in support of their argument and make no argument whatsoever as to the prejudicial effect of giving the instruction. We decline to make their argument for them. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146.)

F.    *The Trial Court Did Not Err in Refusing to Give BAJI 6.15 Which Defined "Emergency."*

Plaintiffs asked the court to instruct the jury with BAJI 6.15, which defines emergency as: "[A]n unforeseen combination [of] circumstances creating a condition which . . . requires immediate care, treatment or surgery in order to protect a person's life or health." The court declined to do so, noting that the instruction was just a definition which did not add anything to the case.

We agree. There was no witness at trial who disputed that Mr. Zannini was in a situation which "require[d] immediate care, treatment or surgery in order to protect a person's life or health." This is a non-issue, perhaps implicitly acknowledged by plaintiffs who cite no points and authorities in support of their argument and fail to argue or establish prejudice.

29

## DISPOSITION

The judgment is affirmed.  Costs are awarded to respondent Mark A. Liker, M.D.

## CERTIFIED FOR PUBLICATION


STRATTON, J.

We concur:


GRIMES, Acting P. J.


HARUTUNIAN, J.*

---

\* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.