Filed 9/25/24  Egge v. County of Santa Clara CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MELISSA KELLY EGGE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF SANTA CLARA,<br><br>    Defendant and Respondent. | H050832<br>(Santa Clara County<br> Super. Ct. No. 18CV329071) |

Physicians at the Santa Clara Valley Medical Center who treated a toddler for broken arms consulted Melissa Kelly Egge, M.D., one of the hospital's child abuse specialists.  Egge initially did not suspect child abuse, but upon further review of the child's chart a few months later, determined that the child's injuries should be reported to Child Protective Services (CPS).  Egge initially understood her direct supervisor would make the report.  On learning that he had reservations about reporting, Egge urged him to document the child's chart but did not report the suspected abuse herself.  The suspicions went unreported, and the child was killed soon after.

The hospital CEO immediately put Egge and her supervisor on administrative leave; the medical staff's peer review committee suspended their clinical privileges; then the county, which operates the hospital, fired both.

1

Egge sued the county for breach of contract and retaliation under Labor Code section 1102.5.[1]  The trial court granted summary judgment in the county's favor and Egge now appeals from the judgment.  Egge argues, on her breach of contract claim, that her submission to the medical staff bylaws as a condition of employment raised a triable issue of material fact on whether the county was contractually obliged to observe her procedural rights under those bylaws.  On her retaliation claim, Egge argues her complaints to the hospital's chair of pediatrics about the hospital's reliance on child abuse specialists to make CPS referrals raised a triable issue of material fact about the county's knowledge of her complaints when firing her.

Concluding that the county is entitled to judgment as a matter of law on both claims, we affirm the order.  (Code Civ. Proc., § 437c, subd. (c).)

## I.    BACKGROUND

### A.    *Overview*

The county operates the Santa Clara Valley Medical Center and is responsible for hiring, disciplining, and terminating physicians employed by the county to work at the hospital.  Physicians hired by the county are "unclassified" at-will employees under the county charter.  During the relevant period, the hospital's senior leadership comprised the following individuals:  (1) Jeff Smith, M.D., County Executive, (2) Paul Lorenz, Chief Executive Officer, (3) Jeffrey Arnold, M.D., Chief Medical Officer, and (4) Paul Russell, M.D., Medical Director.

The county hired Egge in 2011 as a suspected child abuse and neglect (SCAN) specialist for the hospital.  A SCAN specialist is a physician who is board certified in child abuse pediatrics and specially trained to evaluate children's injuries for abuse.  During her employment, Egge's direct supervisor was John Stirling, M.D., another SCAN specialist, and both she and Stirling reported to Stephen Harris, M.D., then-chair

---

[1] Undesignated statutory references are to the Labor Code.

2

of pediatrics.  Egge and Stirling were the hospital's only two SCAN specialists and alternated fielding calls from colleagues about potential child abuse issues.

Like all licensed medical facilities in California, the hospital is required by state regulation to have an "organized medical staff responsible to the [hospital's] governing body for the adequacy and quality of the care rendered to patients."  (Cal. Code Regs., tit. 22, § 70703, subd. (a).)  The medical staff is a separate legal entity from the hospital itself, and "is required to be self-governing and independently responsible from the hospital for its own duties and for policing its member physicians."  (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1130, fn. 2 (*Hongsathavij*).)  State regulation also requires the hospital's medical staff to adopt bylaws which, among other things, "provide formal procedures for the evaluation of staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate."  (Cal. Code Regs., tit. 22, § 70703, subd. (b).)  All physicians practicing at the hospital are required to be members of the medical staff (see Health & Saf. Code, § 1275, subd. (f)), and all members of the medical staff are required to abide by the medical staff bylaws (Cal. Code Regs., tit. 22, § 70703, subd. (b)).  The medical staff does not hire or release physicians from county employment, but if a physician is released from county employment, their medical staff privileges automatically terminate.  During the relevant time, Phuong Nguyen, M.D. served as president of the medical staff.

The Medical Executive Committee is one of the peer review committees constituted through the medical staff bylaws, and authorized to initiate investigations at any time to ensure patient safety.  The committee's duties include "evaluating the performance of a member of the [m]edical [s]taff whenever there is doubt about the member's ability to perform requested privileges and taking such actions as may

3

reasonably be deemed necessary in the best interests of the medical staff and the hospital."

**B.**     ***Relevant Allegations from the Operative Complaint***

Egge's lawsuit arose from the hospital's treatment in July 2015 of A.T., a two-year-old toddler, for two fractures. The treating physician consulted Egge, which Egge alleged was a "common practice . . . by mandated reporters [at the hospital] who suspected abuse in lieu of making a report to [CPS]." After the treating physician described A.T.'s injuries and the mother's explanations for them, Egge opined that the pattern of injury did not suggest child abuse. Over the next few days, other physicians discovered that A.T. had additional fractures, and the child underwent surgery. Stirling was also consulted on A.T.'s case while the child was in the hospital, and despite "a number of red flags," no one reported the injuries to CPS and the hospital discharged A.T.

In November 2015, an orthopedic surgeon reviewing A.T.'s case asked Harris whether a report of suspected child abuse should have been made. Harris asked Egge to review A.T.'s file. Seeing that the child had suffered four fractures, not the two initially disclosed to her in July, Egge told Harris that "a CPS report should have been made." At Harris's request, Egge talked to Stirling about filing a CPS report, and it was ultimately determined that Stirling would make the report.

The next month, Egge asked Stirling if he had reported A.T.'s case to CPS. Stirling had not but, according to Egge's complaint, "promised he would do so that evening." Stirling, however, did not make a CPS report, and A.T. died the next month from abuse.

Egge informed Harris of A.T.'s death and the failure to report the case to CPS. In this conversation with Harris, Egge allegedly "highlighted multiple concerns that [the hospital's] policies and procedures were inadequate to comply with California's mandated reporting laws." Egge allegedly told Harris that many other hospital

4

employees failed to comply with mandated reporting laws, and that the hospital's practice of deferring to SCAN specialists to make CPS reports "resulted in violations of law." Egge also allegedly told Harris about "many other systemic failings which she believed may have contributed to this child's death," including the limited on-call availability of pediatric radiologists or pediatric social workers on weekends and holidays, and a purported absence of hospital policy requiring employees to document when a CPS report had been made.

On learning of A.T.'s death, the hospital CEO (Lorenz) placed Egge and Stirling on administrative leave pending a Medical Executive Committee investigation. In April 2016, that committee completed its investigation and recommended a six-month summary suspension of Egge's clinical privileges and medical staff membership.[2] Nguyen also reported Egge's suspension to the state medical board under Business and Professions Code section 805. The day after the Medical Executive Committee completed the investigation, County Executive Jeff Smith terminated Egge's employment.

Egge sued the county for breach of contract and unlawful retaliation. On her breach of contract claim, Egge alleges that at the time of her hire, she and the county "entered into a contractual employment agreement," and that a component of the agreement required Egge to abide by the medical staff bylaws. Egge contends that her acceptance of the county's employment mutually obliged both her and the county to adhere to medical staff bylaws, and that her suspension and discharge followed a medical staff investigation that violated those bylaws. The basis for Egge's retaliation claim was

---

[2] Egge appealed her summary suspension to the medical staff's Hearing Committee. The Hearing Committee found that Egge's initial assessment of A.T. and her subsequent failure to report A.T.'s injuries to CPS "fell below . . . , and negatively deviated from, Medical Center and Medical Staff standards of care and practice." (Boldface omitted.) But it concluded that the summary suspension of Egge's clinical privileges "was not a reasonable and warranted corrective action." (Boldface omitted.)

5

that the county fired her for complaining to Harris about the hospital's child abuse reporting practices—specifically, the practice of having other physicians consult SCAN specialists about suspected child abuse rather than reporting the suspicions directly to CPS, and other alleged "systemic failings."

## C.    *The Motion for Summary Adjudication*

### 1.    *The County's Evidence*

As to the breach of contract claim, the county put forth the following undisputed material facts in moving for summary adjudication:  (1) the county is a public entity constituted by charter, (2) the county charter designates those it employs as physicians as "unclassified" employees, and (3) as an unclassified employee of the county, Egge's employment was "at will" and she could be discharged without cause.

The county also presented evidence that when Egge was hired, she received from Harris an offer letter setting forth the terms of her employment, including her compensation, benefits, and job responsibilities.  The letter specified that Egge's duties as a SCAN specialist would include phone and inpatient consultation for alleged child abuse.  The letter further specified that "[a]s a member of the medical staff, you will be expected to know, understand and abide by all policies of the Medical Staff Bylaws." The offer letter did not specify a length of employment.  To counter Egge's allegation that the offer letter potentially constituted a written employment contract between herself and the county, the county relied on its charter to establish that it may "only enter contracts through its Board of Supervisors or an officer with specifically delegated authority," and that Harris lacked authority to contract with Egge on the county's behalf.[3]

Finally, the county presented evidence that the hospital "has a [m]edical [s]taff that is a self-governing unincorporated association, independent from the [c]ounty," that

---

[3] Article III, Section 300 of the county charter provides, "The county may exercise its powers only through the Board of Supervisors or officers acting under its authority or of law or of this Charter."

6

the medical staff adopted bylaws, and that the bylaws have no provision stating that they are a part of an employment contract.

As to the retaliation claim, the county presented evidence to negate the existence of a causal link between Egge's protected activity and the county's adverse employment action. The county introduced contemporaneous e-mails between Egge and Stirling, showing that when Egge learned that Stirling had not reported A.T.'s injuries to CPS in December 2015, she neither reported the suspected abuse herself nor further urged Stirling to do so. Although Egge reminded Stirling that they had "talked about reporting it," she closed by telling him, "But either way . . . can you enter a quick note [in the chart]?"

The county relied on Egge's deposition testimony and Harris's declaration to establish that any complaints Egge made about the hospital's child abuse reporting practices were only to Harris. And Harris neither participated in the decision to fire Egge nor shared Egge's complaints with anyone who did. The county provided Smith's declaration that it was Smith who "made the decision to release Egge from her employment." In deciding to fire Egge, Smith consulted "the Chief Medical Officer . . . Dr. Jeffrey Arnold; the Chief Executive Officer . . . Paul Lorenz; and the Medical Director . . . Dr. Paul Russell." Smith did not consult with Nguyen or Harris, nor did he inform them of his decision. According to Smith's declaration, at no point before firing Egge was Smith ever "informed of any complaints by Dr. Egge, including any complaints that the [c]ounty was violating any legal requirements related to Child Abuse reporting, the set-up of the SCAN physician consulting service, staffing, or documentation problems regarding CPS reports."

2.    *Egge's Opposition*

In opposing the county's motion, Egge both disputed the sufficiency of the county's evidence and presented additional evidence of her own.

7

On her breach of contract claim, Egge did not dispute that the county is a public entity, that she was a public employee, or that her employment was at will. Egge relied on the offer letter and the hospital's medical staff bylaws, however, contending that those documents raised an issue of disputed fact as to whether she and the county entered into an enforceable contract that "supplemented" the terms of her public employment.

On the retaliation claim, Egge acknowledged, "[T]here may be no **direct evidence** that the [c]ounty unlawfully retaliated against [her]." She argued, however, that "taking the **circumstantial evidence** at hand and liberally construing all evidence in favor of Dr. Egge . . . the evidence demonstrates it is more likely than not that Dr. Egge's whistleblowing was a contributing factor for the [c]ounty's decision to terminate [her]."

Egge produced her own deposition testimony that she shared with Harris on learning of A.T.'s death her concerns about the hospital's child abuse reporting practices. Egge testified that she told Harris there were "many errors in the care for this child, and that we should review the totality of care." Egge testified she also expressed to Harris concern that the hospital's practice of deferring to SCAN specialists to make child abuse reports effectively held her and Stirling to a "higher standard" than the other mandated reporters and thereby placed her and Stirling at risk.

Egge pointed to the timeline established by the county's evidence—it was "[l]ess than [10] days after her report to [Harris]" that (1) the hospital placed her on administrative leave and (2) the Medical Executive Committee initiated an external peer review into A.T.'s death. Within this timeline, Egge argued that the fact that Harris "reported the facts" of A.T.'s death to CEO Lorenz after speaking with Egge supplied an evidentiary basis to infer that Harris conveyed to Lorenz Egge's concerns about the hospital's child abuse reporting practices, and that Lorenz in turn shared those concerns with Smith.

Egge also pointed to her April 2016 letter to the Medical Executive Committee, which she submitted in response to the committee's invitation to provide written input

8

into the investigation into A.T.'s death. Egge in the letter explained the circumstances of her initial consultation but closed by stating, "Based on my recollection of the case and the materials I reviewed, I think there were system-related issues that contributed to the lack of a report on suspected child abuse being filed on this case. I welcome the opportunity to be involved in institutional discussions related to refining current systems."

Finally, Egge produced the external peer review report of Christine Darr, M.D., whose findings and conclusions the Medical Executive Committee ultimately adopted in concluding its investigation. Darr observed in the report that "any number of professionals could have reported [A.T.'s injuries] to CPS." From this, Egge argued that Darr was necessarily aware of Egge's complaints about the hospital's child abuse reporting practices, and that the Medical Executive Committee had discussed those complaints during the investigation.[4]

## D.     *The Trial Court's Order and Entry of Judgment*

The trial court granted the county's motion.

As to the breach of contract claim, the trial court found that as a public employee, Egge's employment was governed by statute, not contract. The court also rejected Egge's argument that an employment contract was created through Egge's offer letter or through her agreement to abide by the hospital's medical staff bylaws. The court denied Egge leave to amend the complaint to add the medical staff as a defendant, reasoning that amendment "would not overcome the absence of an enforceable employment agreement in the first instance."

---

[4] Darr's report, of course, also made findings about the conduct of Egge and Stirling. Smith terminated Stirling's employment as well as Egge's on the completion of the investigation. The Medical Executive Committee disciplined at least one other physician involved in A.T.'s care.

As to the retaliation claim, the trial court found that the county had met its initial burden of showing that its decisionmakers were unaware of Egge's claimed protected activity, in that Harris had not communicated Egge's complaints to anyone who participated in the decision to fire Egge. The court further found that Egge failed to raise a triable issue of material fact.

After the trial court entered judgment for the county, Egge timely appealed.

## II.    DISCUSSION

### A.    *Standard of Review*

"Summary judgment is properly granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67 (*Morgan*).) A defendant moving for summary judgment "must ' "show[] that one or more elements of the cause of action . . . cannot be established" by the plaintiff.' [Citation.] That burden is met when a defendant presents affirmative evidence that negates an essential element of the plaintiff's claim." (*Santa Clara Valley Water District v. Century Indemnity Co.* (2023) 89 Cal.App.5th 1016, 1034 (*Santa Clara Valley Water District*).) If the defendant meets this initial burden, " 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action . . . [and] set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' [Citation.]" (*Id.* at p. 1035.)

We review de novo the trial court's decision to grant summary judgment. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767, citing Code Civ. Proc., § 437c, subd. (c).) In so doing, we "view the evidence in a light favorable to plaintiff as the [opposing party] . . . liberally construing her evidentiary submission while strictly scrutinizing defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Id.* at p. 768.) While the party opposing summary judgment may rely on inferences, " 'those inferences must be reasonably deducible from

10

the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork.  [Citation.]' " (*Santa Clara Valley Water District*, *supra*, 89 Cal.App.5th at p. 1035.)

**B.**     ***Breach of Contract***

As to her first cause of action, Egge argues that the county breached the medical staff bylaws by summarily suspending her privileges and membership without evidence of imminent harm, failing to timely convene a hearing to review the summary suspension, and disciplining Egge for actions she took as a part of a quality improvement review.  As in the trial court, however, Egge conflates the county with the hospital's medical staff—"a separate legal entity . . . which is required to be self-governing and independently responsible from the hospital." (*Hongsathavij*, *supra*, 62 Cal.App.4th at p. 1130, fn. 2.)  Egge's relationship with the nonparty medical staff and its peer review committee was governed by the medical staff bylaws as a matter of state regulation (see Cal. Code of Regs., tit. 22, § 70703); her employment with the county was governed by statute (see *Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 164); neither were governed by a contract.

**1.**     ***Absence of Express or Implied Contract***

In California, a "public employee, whether civil service or not, cannot state a cause of action for breach of contract . . . arising out of the public employment relationship," and the employee's remedies are "limited to those provided by statute or ordinance." (*Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 207.)  The undisputed facts establish that the county is a public entity, that Egge was a public employee, and that Egge's employment was of an "unclassified," and "at-will" nature.  Egge is thus precluded, as a matter of law, from stating a breach of contract claim against the county arising out of the employment relationship.

Egge argues that by including in her offer letter a condition that she abide by the medical staff bylaws, the parties effectively entered into a separate employment contract.

11

In support of her position, Egge notes that the " 'ordinary rule that public employment is a creature of statute, [is] of "limited force" when "the parties are legally authorized to enter (and have in fact entered) into bilateral contracts to govern the employment relationship." ' " (*Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965, 980 (*Cal Fire*), quoting *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1182 (*Retired Employees*).) Egge reads this decisional law too broadly.

In *Retired Employees*, the Supreme Court recognized that "[a] contractual right can be implied [against a public entity] *from legislation*" that " 'clearly " . . . evince[s] a legislative intent to create private rights of a contractual nature enforceable against the [governmental body]." ' " (*Retired Employees*, *supra*, 52 Cal.4th at p. 1187, italics added.) "Where, for example, the legislation is itself the ratification or approval of a contract, the intent to make a contract is clearly shown." (*Ibid*.)

Central to *Retired Employees*' holding are two factors not present here: (1) the existence of "valid bilateral [employment] contracts" (*Retired Employees*, *supra*, 52 Cal.4th at p. 1183), and (2) the board of supervisors' ratification of those contracts, which "provided the requisite clear manifestation of intent to create contractual rights." (*Cal Fire*, *supra*, 6 Cal.5th at p. 981). Egge asks us to imply a contract from the terms of her offer letter, not from the county government's ratification of an express contract. This goes too far, as *Retired Employees* "found the existence of the [express contracts] critical to its conclusion that an implied contractual right could have been created." (*Cal Fire*, at p. 980; see also *Retired Employees*, at p. 1185 [emphasizing that plaintiff sought recognition of an implied term in an existing contract, not an implied contract].) And even if we could construe Egge's offer letter as the tender of an employment contract, the county board of supervisors never ratified the offer letter or otherwise gave any "clear manifestation of intent to create contractual rights" in Egge's favor. (See *Cal Fire*, at

12

p. 981.)  Absent action by the only legislative body authorized to act on the county's behalf, we have no basis to imply an employment contract between the county and Egge.

## 2. *Absence of Consideration*

Egge's contention that her agreement to be bound by the medical staff bylaws obligated the county to observe her rights under those bylaws fails for another independent reason:  Her compliance with an independent legal duty cannot serve as consideration for the contractual duty she would impose on the county.  (*O'Byrne v. Santa Monica-UCLA Medical Center* (2001) 94 Cal.App.4th 797, 806–807 (*O'Byrne*).)  As is well established, "a contract requires consideration," defined as " '[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled . . . .'  (Civ. Code, § 1605.)"  (*O'Byrne*, at p. 808.)  By contrast, "[a] statutory or legal obligation to perform an act may not constitute consideration for a contract."  (*Ibid*.)  California Code of Regulations, title 22, section 70703 requires a hospital's medical staff to adopt bylaws and its members to abide by these bylaws.  (See *O'Byrne*, at p. 808.)  Because members of the medical staff are "required by law to abide by the [attending staff bylaws] under section 70703," their agreement to do so is not valid consideration.  (*O'Byrne*, at pp. 808, 810.)  As a member of the medical staff, Egge was required to abide by the medical staff bylaws, whatever the offer letter.  The offer letter's recitation of an otherwise mandatory duty does not convert Egge's preexisting legal obligation into a contractual one.

Egge relies inaptly on *Janda v. Madera Community Hosp.* (E.D.Cal. 1998) 16 F.Supp.2d 1181 (*Janda*) to argue that valid consideration existed because the hospital's medical staff bylaws are "more expansive and comprehensive than the minimum requirements of California law."  (*Janda*, at p. 1187.)  But *Janda* examined the contractual effect of a hospital's governing body bylaws adopted under California Code of Regulations, title 22, section 70701, not medical staff bylaws adopted under

13

section 70703.[5]  And *Janda*'s holding turned expressly on the distinction between the two regulatory provisions:  While section 70703 "requires physicians comply with the rules adopted by the *medical staff* . . . , [i]t does not impose a requirement on physicians to comply with the bylaws adopted by the *governing body* of the hospital."  (*Janda*, at p. 1187.)  Indeed, as the *O'Byrne* court later recognized, "*Janda* itself suggested its conclusion would have been different had it been the medical staff bylaws at issue in the case rather than the hospital's governing body's bylaws."  (*O'Byrne*, *supra*, 94 Cal.App.4th at p. 808.)

We conclude that Egge's public employment was at will and governed by charter and ordinance, not contract, and that neither the offer letter nor Egge's agreement to abide by the medical staff bylaws sufficed to form a separately enforceable employment contract.  Accordingly, the trial court properly granted summary adjudication in favor of the county as to this cause of action.  (Code Civ. Proc., § 437c, subds. (c), (o)(2).)

### 3.    *Denial of Leave to Amend*

Egge argues the trial court abused its discretion by not granting her leave to amend the complaint to add the medical staff as a defendant in her breach of contract claim. Although Egge is correct that "great liberality" should generally be exercised in granting a plaintiff leave to amend her complaint, " ' "[l]eave to amend should not be granted where . . . amendment would be futile." ' "  (*Rocha v. U-Haul Co. of California* (2023) 88 Cal.App.5th 65, 75.)  Egge has failed to demonstrate that the terms of her county employment were governed by an enforceable contract—with the county, with the

---

[5] "Hospitals in this state have a dual structure, consisting of an administrative governing body, which oversees the operations of the hospital, and a medical staff, which provides medical services and is generally responsible for ensuring that its members provide adequate medical care to patients at the hospital."  (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 983.)  Consistent with this structure, California Code of Regulations, title 22, section 70701 sets forth the rules and regulations for the hospital's administrative governing body, while section 70703 sets forth the rules and regulations for the medical staff.

hospital, or with the medical staff. As the trial court found, amending the complaint would not help Egge to "overcome the absence of an enforceable employment agreement in the first instance."

Moreover, " ' " 'even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial.' " ' " (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345.) The trial court did not abuse its discretion in finding Egge's request to amend to be unreasonably delayed. Egge understood the medical staff to be a separate legal entity from the county and acknowledged that fact as early as 2019, when she first indicated her intention to add the medical staff as a defendant. She did not do so, and indeed, did not seek to further amend the complaint to add the medical staff until after the county had filed for summary judgment. She did not provide reasons for this multiyear delay, and the trial court was entitled to deny her request to amend on the basis of such delay alone.

The trial court thus acted within its discretion in denying Egge leave to amend.

## C.  *Whistleblower Retaliation (Section 1102.5)*

Egge next contends the trial court erred in granting summary adjudication in favor of the county on her second cause of action, alleging whistleblower retaliation under section 1102.5. Section 1102.5 prohibits an employer from retaliating against an employee for disclosing information the employee has "reasonable cause to believe" reveals a violation of a local, state, or federal law or regulation. (§ 1102.5, subd. (b); *Lawson v. PPG Architectural Finishes, Inc*. (2022) 12 Cal.5th 703, 709 (*Lawson*).) A plaintiff claiming whistleblower retaliation bears the burden of establishing "by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action." (*Id*. at p. 718.) Once the plaintiff has made this prima facie showing, the burden shifts to the employer to demonstrate, "by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in

15

protected activity." (*Ibid.*; see also *Vatalaro v. County of Sacramento* (2022) 79 Cal.App.5th 367, 379–380.)

To establish a prima facie case under section 1102.5, a plaintiff must show: (1) that she engaged in a protected activity; (2) that she was then subjected to adverse employment action; and (3) that there is a causal link between the two. (*Lawson*, *supra*, 12 Cal.5th at p. 710; *Morgan*, *supra*, 88 Cal.App.4th at p. 69.) We assume without deciding that Egge's purported complaints to Harris regarding the adequacy of the hospital's child abuse reporting practices constituted a protected activity. We nevertheless conclude in our independent judgment that Egge cannot establish a causal link between her protected activity and the later termination of her county employment.

### 1. *The County Presented Sufficient Evidence to Negate a Causal Link*

The causal link element for a retaliation claim " ' "may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.' " ' " (*Morgan*, *supra*, 88 Cal.App.4th at p. 69.) But " '[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.' " (*Id.* at p. 70.)

Accordingly, the county supported its motion for summary adjudication with evidence that those who participated in Egge's firing were unaware of her purportedly protected activities. Although Egge testified in her deposition that she reported concerns about the adequacy of the hospital's child abuse reporting practices to Harris, Harris did not participate in the decision to fire Egge or even learn of that decision until after the fact. Harris declared that he "did not communicate with Phuong Nguyen, Jeff Smith, Jeffrey Arnold, Paul Lorenz, or Paul Russell about any alleged concerns Dr. Egge claims she raised (e.g., illegal or improper practices at [the hospital] regarding [c]hild [a]buse reporting, availability of pediatric radiologists and pediatric social workers, or documentation of CPS reports in the medical record)."

16

Lorenz, who consulted with Smith on Egge's firing, confirmed that he "was never informed by any person that Dr. Egge made complaints that the [c]ounty was violating any legal requirements; was engaging in unlawful or improper practices related the [c]hild [a]buse reporting; had staff problems relating to pediatric radiologist[s] or pediatric social workers; or that staff failed to document CPS reports in the medical record."

Finally, Smith stated in his declaration that before deciding to release Egge from county employment, he consulted with Arnold, Lorenz, and Russell only. He did not consult with Harris concerning Egge, and was "never informed of any complaints by Dr. Egge, including any complaints that the [c]ounty was violating any legal requirements related to [c]hild abuse reporting, the set-up of the SCAN physician consulting service, staffing, or documentation problems regarding CPS reports."

The county's evidence suffices to meet its initial burden, in that it "affirmative[ly] . . . negates" the causation element of Egge's retaliation claim. (See *Santa Clara Valley Water District*, *supra*, 89 Cal.App.5th at p. 1034.) Its evidence establishes that neither Smith, nor the individuals with whom he consulted, knew of Egge's purportedly protected activities at the time Smith made the decision to fire Egge. Smith and Lorenz affirmatively denied such knowledge, and while the county did not submit affirmative evidence from Arnold or Russell, it did not have to because Egge never disputed that she made her complaints about the hospital's practices to Harris only, and Harris is clear that he neither participated in the decision to fire Egge, nor shared her alleged concerns with Arnold or Russell.

Egge nevertheless argues, relying on this court's decision in *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95 (*Reeves*), that it is "legally insufficient for the [c]ounty to simply claim that Dr. Smith made the termination decision and was unaware of [p]laintiff's complaints." Egge maintains that to prevail on summary adjudication, the

17

county must establish that "none of the individuals that contributed to the termination decision knew that [Egge] had complained about unlawful practices at [the hospital]."

Egge correctly notes that an employer does not negate causation without establishing that all actors who "materially contributed" to the decision to fire her were unaware of her putative protected activity. (See *Reeves*, *supra*, 121 Cal.App.4th at p. 110.) But Egge mischaracterizes the county's showing as merely establishing Smith's lack of knowledge. The county met its initial burden by showing as well that Egge communicated her protected activity only to Harris, and that Harris did not communicate it to any of the others who participated in the decision to fire Egge—Lorenz, Arnold, and Russell.

In sum, we conclude that the evidence presented by the county in support of summary adjudication meets its initial burden to negate the causation element of Egge's retaliation claim, thereby shifting the burden to Egge to show that there remains a triable issue of fact as to that claim. (*Santa Clara Valley Water District*, *supra*, 89 Cal.App.5th at p. 1035.)

### 2. *Egge Cannot Show a Triable Issue of Fact*

Egge first argues that whether Lorenz had knowledge of Egge's purportedly protected activities is a disputed fact. For support, Egge cites the declarations of Lorenz, Harris, and Smith. Egge references Harris's recollection that soon after speaking with Egge about A.T.'s death, Harris spoke with Lorenz, who later consulted with Smith about Egge's firing. Egge also references portions of Lorenz's declaration where Lorenz confirmed speaking with Harris, and later conferred with Smith regarding Egge's termination. Based on evidence that Egge told Harris of her concerns, that Harris then spoke with Lorenz about A.T.'s death, and that Lorenz later spoke with Smith, Egge

18

invites us to infer that when she was fired, Lorenz "likely had knowledge of [Egge's] complaints to [Harris]," contrary to Lorenz's declaration.

But while the party opposing summary judgment may rely on inferences, " 'those inferences must be reasonably deducible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork. [Citation.]' " (*Santa Clara Valley Water District, supra*, 89 Cal.App.5th at p. 1035.)  Even viewing this evidence in a light most favorable to Egge and drawing all reasonable inferences in her favor, we see no triable issue of fact.  What Harris averred he reported to Lorenz were the "facts" of A.T.'s death, not Egge's "alleged concerns" regarding the hospital's child abuse reporting policies and practices.  Lorenz confirmed that he and Harris spoke about A.T.'s death and Egge and Stirling's failure to make a report to CPS.  Lorenz expressly disavowed being informed by Harris—or anyone—that Egge had made complaints about the hospital's child abuse reporting policies or practices.  And Egge can point to no contrary evidence.

Egge next argues that Smith must have known of Egge's complaints about the hospital's child abuse reporting practices because (1) Smith consulted with Arnold before firing her, (2) Arnold participated in the investigation of the Medical Executive Committee, and therefore must have shared the committee's findings with Smith, and (3) the Medical Executive Committee's investigation surely had unearthed the concerns Egge reported to Harris.  Put another way, Egge invites us to infer that her complaints to the hospital's chair of pediatrics about the hospital's child abuse reporting practices constituted such a central part of the medial staff's investigation into A.T.'s death that it would be "illogical" for Smith, Arnold, and Lorenz, the county officials involved in her termination, not to have known of and discussed those complaints while discussing the investigation.

While Egge is correct that Arnold participated in several sessions of the Medical Executive Committee during the committee's investigation into A.T.'s death, she can point to no evidence to substantiate her speculation about what Arnold and the Medical

19

Executive Committee knew of her concerns—not even a declaration of her own. If Egge had shared with the committee her concern that hospital policy and procedure discouraged mandated reporters from directly reporting suspected child abuse and instead encouraged them to delegate their reporting duties to Egge and Stirling, neither her evidence nor Egge's opposition to the county's motion gives any hint of this. Her April 2016 letter to the committee—her opportunity under the peer review policy to provide input to the Medical Executive Committee's investigation into her conduct—merely alluded to "system-related issues" and offered "to be involved in institutional discussions related to refining current systems." The letter did not outline any of the concerns Egge specifically alleges she raised with Harris—namely, "illegal or improper practices at [the hospital] regarding [c]hild [a]buse reporting, availability of pediatric radiologists and pediatric social workers, or documentation of CPS reports in the medical record." On its own, the letter does not put even the Medical Executive Committee on notice of the concerns relating to hospital policy or procedure that Egge elsewhere recounts reporting to Harris, nor is it sufficient to raise a triable issue of fact on notice to the county and causation.

Darr's external peer review report similarly raises no triable issue of fact on whether Arnold and the Medical Executive Committee had knowledge of Egge's complaints. The report itself confirms that the investigation focused on Egge's conduct in the consultation and follow-up about the potential abuse of A.T., not on hospital policies and practices or Egge's alleged complaints about them. Pointing to Darr's observation in the report that others could have reported the suspected abuse to CPS, Egge argues that this statement supports an inference that Darr (and by extension, the committee, Arnold, and the county) had knowledge of Egge's complaints to Harris regarding the hospital's reporting practices. Not so. Egge supplies no basis to infer that this observation derived from Egge's complaints rather than Darr's independent investigation into the circumstances leading to A.T.'s death. Like Egge's letter to the

20

committee, neither the committee minutes nor Darr's report ever mentioned Egge's alleged complaints about the hospital's "systemic failures in CPS reporting." And Egge does not otherwise explain how Arnold would have learned of those complaints—given Harris's unequivocal assertion in his declaration that he never shared Egge's complaints with Arnold.

Viewing the evidence independently and in a light most favorable to Egge and drawing all reasonable inferences in Egge's favor, we nevertheless conclude that the county put forth sufficient evidence to negate the existence of any causal link between Egge's purportedly protected activity and the termination of her employment, and that Egge failed to rebut that evidence by raising a triable issue of fact. The county is accordingly entitled to summary adjudication on Egge's whistleblower retaliation claim.

## III. DISPOSITION

The order granting summary judgment is affirmed. Costs on appeal are awarded to the county. (Cal. Rules of Court, rule 8.278(a)(1).)

21

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

GROVER, J.

*Egge v. County of Santa Clara*
H050832

22